# Exhibit A

 CT Corporation

<div align="right">

**Service of Process Transmittal**
09/15/2020
CT Log Number 538251259

</div>

**TO:**     Lynn Gompper
Johnson Controls, Inc.
5757 N GREEN BAY AVE
MILWAUKEE, WI 53209-4408

**RE:**     **Process Served in California**

**FOR:**     Tyco Fire Products L.P.   (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Teresa Mauldin, etc., et al., Pltfs. vs. 3M Company, et al., Dfts. // To: Tyco Fire Products L.P. |
| **DOCUMENT(S) SERVED:** | - |
| **COURT/AGENCY:** | None Specified<br>Case # 20CV370176 |
| **NATURE OF ACTION:** | Personal Injury - Exposure to Welding Fumes |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Los Angeles, CA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 09/15/2020 at 14:43 |
| **JURISDICTION SERVED :** | California |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | None Specified |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  UPS Next Day Air , 1ZX212780130454831 |
| | Image SOP |
| | Email Notification,  Greg Reynolds  Gregory.Reynolds@JCI.com |
| | Email Notification,  Ian Botnick  ian.botnick@jci.com |
| | Email Notification,  Lynn Gompper  lynn.m.gompper@jci.com |
| | Email Notification,  Greg Reynolds  Gregory.Reynolds@JCI.com |
| | Email Notification,  Elayne Mozen  elayne.mozen@jci.com |
| **SIGNED:**<br>**ADDRESS:** | C T Corporation System<br>1999 Bryan St Ste 900<br>Dallas, TX 75201-3140 |
| **For Questions:** | 877-564-7529<br>MajorAccountTeam2@wolterskluwer.com |

<div align="right">

Page 1 of  1 / SK

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

</div>



## PROCESS SERVER DELIVERY DETAILS

| | |
|---|---|
| **Date:** | Tue, Sep 15, 2020 |
| **Server Name:** | Bruce Anderson |
| **Location:** | Los Angeles, CA |

| | |
|---|---|
| Entity Served | TYCO FIRE PRODUCTS, L.P. |
| Agent Name | CT CORPORATION SYSTEM |
| Case Number | 20CV370176 |
| Jurisdiction | CA |



**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

SEP 1 5 2020

Y.16

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

E-FILED
9/11/2020 11:39 AM
Clerk of Court
Superior Court of CA,
County of Santa Clara
20CV370176
Reviewed By: R. Walker
Envelope: 4916654

### NOTICE TO DEFENDANT:
*(AVISO AL DEMANDADO):*

3M Company, E.I. Du Pont De Nemours and Company, The Chemours Company, LLC, AND ATTACHMENT 1

### YOU ARE BEING SUED BY PLAINTIFF:
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Teresa Mauldin, Todd Spellman, Gary Weekley, Kevin Bebee, Dan Stapp, AND ATTACHMENT 2

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: <br> *(El nombre y dirección de la corte es):* Santa Clara County Superior Court <br> Downtown Superior Court <br> 191 N. First Street, San Jose, CA 95113 | CASE NUMBER: *(Número del Caso):* <br> **20CV370176** |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Jonathan K. Levine, Pritzker Levine LLP, 1900 Powell St., Ste. 450, Emeryville, CA 94608; (415) 692-0772

| DATE: <br> *(Fecha)* 9/11/2020 11:39 AM | Clerk of Court | Clerk, by <br> *(Secretario)* | R. Walker | , Deputy <br> *(Adjunto)* |
|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010).)*

**NOTICE TO THE PERSON SERVED:** You are served


[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☑ on behalf of (specify): Tyco Fire Products, LP

   under: ☑ CCP 416.10 (corporation)  ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
   ☐ other *(specify)*:
4. ☐ by personal delivery on *(date)* SEP 1 5 2020

Page 1 of 1

Form Adopted for Mandatory Use <br> Judicial Council of California <br> SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Mauldin, et al. v. 3M Company, et al. | 20CV370176 |

**ATTACHMENT** *(Number):*  __1__

*(This Attachment may be used with any Judicial Council form.)*

ARCHROMA U.S., INC., ARKEMA, INC., AGC CHEMICALS AMERICAS, INC., DAIKIN AMERICA, INC., SOLVAY SPECIALTY POLYMERS, USA, L.L.C., JOHNSON CONTROLS, INC., TYCO FIRE PRODUCTS, L.P., NATIONAL FOAM, INC., CHEMGUARD, INC., CARRIER GLOBAL CORP., KIDDE FIREFIGHTING INC., KIDDE-FENWAL, INC., PERIMETER SOLUTIONS, LP, FIRE SERVICE PLUS, INC., BUCKEYE FIRE EQUIPMENT, AMEREX CORP., DYNAX CORP., MSA SAFETY, INC., LION GROUP, INC., L.N. CURTIS & SONS, W. L. GORE & ASSOCIATES, INC., ROYAL TEN CATE US, INC., PBI PERFORMANCE PRODUCTS, INC.,  ALLSTAR FIRE EQUIPMENT, and DOES 1 through 25

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page __1__ of __1__

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT**
**to Judicial Council Form**

www.courtinfo.ca.gov

MC-025

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Mauldin, et al. v. 3M Company, et al. | **20CV370176** |

ATTACHMENT *(Number):*  2

*(This Attachment may be used with any Judicial Council form.)*

BOB BACON, JOHN CASTRO, LUIS CHACON, FRANK DIAZ, FELIX DIAZ, PAUL EDEN, JOHN LAURENT, LARRY NOON, ROB PIPER, STEVE PIZZO, MOSES SALAS, MIKE SANCHEZ, ED SOLANO, MARC STELLING, MIKE TALLERICO, MIKE TAPIA, EUNICO TRINIDAD, GEORGE VEGA, WILLIAM STAPLES, BRIDGET TAPIA, VICTORIA BEBEE, and KATHY PIPER

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page  1  of  1

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT**
**to Judicial Council Form**

www.courtinfo.ca.gov

E-FILED
9/11/2020 11:39 AM
Clerk of Court
Superior Court of CA,
County of Santa Clara
20CV370176
Reviewed By: R. Walker

ELIZABETH C. PRITZKER (SBN: 146267)
JONATHAN K. LEVINE (SBN: 220289)
BETHANY L. CARACUZZO (SBN: 190687)
HEATHER P. HAGGARTY (SBN: 244186)
RICHARD R. SEAL (SBN: 311131)
**PRITZKER LEVINE LLP**
1900 Powell Street, Suite 450
Emeryville, California 94608
Telephone: (415) 692-0772
Facsimile: (415) 366-6110
Email: ecp@pritzkerlevine.com; jkl@pritzkerlevine.com
         bc@pritzkerlevine.com; hph@pritzkerlevine.com
         rrs@pritzkerlevine.com

*Attorneys for Plaintiffs*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA CLARA**

| | |
|---|---|
| TERESA MAULDIN, TODD SPELLMAN, GARY WEEKLEY, KEVIN BEBEE, DAN STAPP, BOB BACON, JOHN CASTRO, LUIS CHACON, FRANK DIAZ, FELIX DIAZ, PAUL EDEN, JOHN LAURENT, LARRY NOON, ROB PIPER, STEVE PIZZO, MOSES SALAS, MIKE SANCHEZ, ED SOLANO, MARC STELLING, MIKE TALLERICO, MIKE TAPIA, EUNICO TRINIDAD, GEORGE VEGA, WILLIAM STAPLES, BRIDGET TAPIA, VICTORIA BEBEE, and KATHY PIPER,<br><br>Plaintiffs,<br><br>vs.<br><br>3M COMPANY, E. I. DU PONT DE NEMOURS & CO., THE CHEMOURS COMPANY L.L.C., ARCHROMA U.S., INC., ARKEMA, INC., AGC CHEMICALS AMERICAS, INC., DAIKIN AMERICA, INC., SOLVAY SPECIALTY POLYMERS, USA, L.L.C., JOHNSON CONTROLS, INC., TYCO FIRE PRODUCTS, L.P., NATIONAL FOAM, INC., CHEMGUARD, INC., CARRIER GLOBAL CORPORATION, KIDDE FIREFIGHTING INC., KIDDE-FENWAL, | **Case No: 20CV370176**<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br><br><br>**DEMAND FOR JURY TRIAL** |

- 1 -
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

INC., PERIMETER SOLUTIONS, LP, FIRE SERVICE PLUS, INC., BUCKEYE FIRE EQUIPMENT, AMEREX CORPORATION, DYNAX CORPORATION, MSA SAFETY, INC., LION GROUP, INC., L.N. CURTIS & SONS, W. L. GORE & ASSOCIATES, INC., ROYAL TEN CATE US, INC., PBI PERFORMANCE PRODUCTS, INC., ALLSTAR FIRE EQUIPMENT, and DOES 1 through 25,

Defendants,

Plaintiffs Teresa Mauldin, Todd Spellman, Gary Weekley, Kevin Bebee, Dan Stapp, Bob Bacon, John Castro, Luis Chacon, Frank Diaz, Felix Diaz, Paul Eden, John Laurent, Larry Noon, Rob Piper, Steve Pizzo, Moses Salas, Mike Sanchez, Ed Solano, Marc Stelling, Mike Tallerico, Mike Tapia, Eunico Trinidad, George Vega, William Staples, Bridget Tapia, Victoria Bebee, and Kathy Piper, by and through their attorneys of record, allege as follows:

## INTRODUCTION

1.      Plaintiffs are 24 current and retired firefighters (collectively, the "Firefighter Plaintiffs") who have served the San Jose, Santa Clara, and Gilroy communities as firefighters and worked in various fire stations, engine, truck, and specialized companies in the County of Santa Clara for decades, and three of their spouses (collectively, the "Spouse Plaintiffs").

2.      Plaintiffs bring this action for monetary damages and appropriate equitable and injunctive relief for harm resulting from exposure to per- and polyfluoroalkyl substances ("PFAS") that were manufactured, designed, sold, supplied, distributed and/or contained in products manufactured, designed, sold, supplied and/or distributed by each of the Defendants, individually or through their predecessors or subsidiaries

3.      PFAS are human-made chemicals consisting of a chain of carbon and fluorine atoms used in manufactured products to, *inter alia*, resist and repel oil, stains, heat and water. PFAS include "long-chain" PFAS made up of eight or more carbon atoms ("long-chain PFAS") as well as "short-

- 2 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

chain" PFAS made up of six or fewer carbon atoms ("short-chain PFAS").

4. PFAS are known as "forever chemicals" because they are immune to degradation, bio-accumulate in individual organisms and humans, and increase in concentration up the food chain. PFAS exposure to humans can occur through inhalation, ingestion and dermal contact.[1]

5. PFAS have been associated with multiple and serious adverse health effects in humans including cancer, liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension. PFAS have also been found to concentrate in human blood, bones and organs.

6. Unbeknownst to Plaintiffs, Defendants have manufactured, marketed, distributed, sold, or used PFAS and PFAS-containing materials in Class B firefighting foams ("Class B foam")[2] and in protective clothing specifically designed for firefighters ("turnouts").

7. For decades, Defendants were aware of the toxic nature of PFAS and the harmful impact these substances have on human health. Yet, Defendants manufactured, designed, marketed, sold, supplied, or distributed PFAS and PFAS chemical feedstock,[3] as well PFAS-containing Class B foam and turnouts, to firefighting training facilities and fire departments nationally, including in California and in Santa Clara County. Defendants did so, moreover, without ever informing firefighters or the public that their Class B foams and turnouts contained PFAS, and without warning firefighters or the public of the substantial and serious health injuries that can result from exposure to PFAS or PFAS-containing materials.

8. The Firefighter Plaintiffs wore turnouts and used Class B foam in the usual and normal course of performing their firefighting duties and training. They did not know and, in the exercise of reasonable diligence, could not have known that these products contained PFAS or PFAS-

---

[1] Suzanne E. Fenton, MS, PhD, *PFAS Collection*, Environmental Health Perspectives (February 22, 2019), https://ehp.niehs.nih.gov/curated-collections/pfas.

[2] Class B foams are synthetic "soap-like" foams that spread rapidly across the surface of a fuel or chemical fire to stop the formation of flammable vapors. The most common Class B foam is aqueous film-forming foam (or "AFFF").

[3] Chemical feedstock refers to a chemical used to support a large-scale chemical reaction. The PFAS chemicals utilized to manufacture products containing PFAS are generally referred to herein as "chemical feedstock."

- 3 -
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

containing materials. Instead, at all relevant times and continuing to the present, Defendants represented their Class B foams and turnouts as safe.

9.    The Firefighter Plaintiffs did not learn of their PFAS exposure until July 2020, when blood serum tests revealed that each of them has significantly elevated levels of PFAS in their blood.

10.    The Firefighter Plaintiffs use and/or used the Class B foam and turnouts as they were intended and in a foreseeable manner which exposed them to PFAS in the course of their firefighting activities. This repeated and extensive exposure to PFAS resulted in cancers and other serious and life-threatening diseases to the Firefighter Plaintiffs. Their PFAS exposures continue to pose a significant threat to their personal health due to PFAS' persistence, pervasiveness, toxicity and bioaccumulation.

11.    Defendants knowingly and willfully manufactured, designed, marketed, sold, and distributed chemicals and/or products containing PFAS for use within the State of California when they knew or reasonably should have known that the Firefighter Plaintiffs would repeatedly inhale and/or have dermal contact with these harmful compounds during firefighting training exercises and in firefighting emergencies, and that such exposure would threaten the health and welfare of firefighters exposed to these dangerous and hazardous chemicals.

12.    Plaintiffs bring this action against Defendants and seek damages, together with any appropriate injunctive or other equitable relief.

## PARTIES TO THE ACTION

### Plaintiffs

### A.    The Firefighter Plaintiffs

13.    Teresa Mauldin worked for 20 years in the City of San Jose Fire Department ("SJFD"). She worked as a firefighter and fire engineer at one of busiest fire stations in the United States, SJFD Fire Station 2 ("The Rock"), serving the Alum Rock district of San Jose. Teresa was promoted to fire inspector and later became an arson investigator. Teresa's firefighter training included incident command; fire suppression for structures, vehicles and grassland (including use and application of foam); search and rescue; ventilation operations; salvage and overhaul; and emergency medical training. She also received specialized training as an arson investigator. During her career, she

- 4 -
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

responded to approximately 100 calls a year and, by the end, had responded to 600 fire calls. In the course of firefighting training and fire suppression activities, she routinely used Class B foam and wore turnouts that, unbeknownst to her, contained PFAS or PFAS-containing materials. She was unaware that the Class B foam she used and the turnouts she wore contained PFAS or PFAS-containing materials. Blood serum testing conducted in July 2020 shows her PFAS levels are significantly elevated. She has been diagnosed with and treated for bladder cancer (as well as a reoccurrence) and for breast cancer.

14.     Todd Spellman was in the fire service for 29 years in the City of San Jose Fire Department. He worked as a volunteer firefighter, firefighter, and fire captain on the Hazardous Incident Team ("HIT) at SJFD Fire Station 29, serving the neighborhoods of north San Jose. In 1999, he was awarded Firefighter of the Year. Todd's firefighter training included incident command; fire suppression for structures, vehicles and grassland (including use and application of foam); search and rescue; ventilation operations; salvage and overhaul; and emergency medical training. Todd also received specialized training related to hazardous materials incidents and ARFF (aircraft rescue firefighter). The HIT team responded to calls for flammable liquid spills, drug labs, vehicle accidents and hazardous materials incidents. As captain, Todd was responsible for developing appropriate tactics and strategy to safely mitigate the hazardous material incident. In this role, Todd received such comprehensive hazardous material training in risk assessment, risk-exposure and tactical decision-making that he became a specialist in hazardous materials first responder operations. In the course of firefighting training and fire suppression activities, he routinely used Class B foam and wore turnouts that, unbeknownst to him contained PFAS or PFAS-containing materials. He was unaware that the Class B foam he used and the turnouts he wore contained PFAS or PFAS-containing materials. Blood serum testing conducted in July 2020 shows his PFAS levels are significantly elevated. Todd was diagnosed with prostate cancer and is currently being treated.

15.     Gary Weekley was in the fire service for 30 years, 27 of which were in the City of San Jose Fire Department. He worked as a firefighter, fire engineer, fire captain, and battalion chief, spending many years working at SJFD's busiest engine Fire Station 8, serving the Naglee Park district of San Jose, as well as Station 5 in San Jose's industrial area. Gary's firefighter training

- 5 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

included incident command; fire suppression for structures, vehicles and grassland (including use and application of foam); search and rescue; ventilation operations; salvage and overhaul; and emergency medical training. He also received specialized training in high-rise fire ground command, low-angle rope rescue operations, and fire administration. As a battalion chief, Gary was in charge of supervision, administration and large emergency incidents, and training for six stations. He also worked as both the training and ARFF program manager, as well as at a station that specialized in hazardous materials calls. Gary volunteered for 15 years with the Valley Medical Center Burn Center Foundation to raise money for the local burn unit. He spent one week each summer at a summer camp for children burn survivors - something he considers to be one of his most privileged and fulfilling memories. In the course of firefighting training and fire suppression activities, Gary routinely used Class B foam and wore turnouts that, unbeknownst to him contained PFAS or PFAS-containing materials. He was unaware that the Class B foam he used and the turnouts he wore contained PFAS or PFAS-containing materials. Blood serum testing conducted in July 2020 shows his PFAS levels are significantly elevated. He has been diagnosed with and has been treated for prostate cancer.

16.    Kevin Bebee has been in the fire service for 24 years in the Santa Clara, Contra Costa County and Gilroy Fire Departments, working as a volunteer firefighter, firefighter, and is currently a fire engineer serving the Gilroy community at the Chestnut Station. Kevin's firefighter training included incident command; fire suppression for structures, vehicles and grassland (including use and application of foam); search and rescue; ventilation operations; salvage and overhaul; and emergency medical training. Kevin has also received specialized training in low-angle rope rescue. In 2019, Kevin was volunteering at the first aid station at the Gilroy Garlic Festival when a mass shooter opened fire on the crowd. He was assigned to be the triage, treatment, and transport officer in which he was responsible for triaging victims and arranging for medical treatment before being transported to the hospital. For his bravery and service, he was honored with a Medal of Valor from the State of California EMSA. In the course of firefighting training and fire suppression activities, Kevin routinely uses and has routinely used Class B foam and wore turnouts that, unbeknownst to him contained PFAS or PFAS-containing materials. He was unaware that the Class B foam he used

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

and the turnouts he wore contained PFAS or PFAS-containing materials. Blood serum testing conducted in July 2020 shows his PFAS levels are significantly elevated. Kevin has been diagnosed with and treated for testicular cancer.

17.     Dan Stapp was in the fire service for 31 years in the City of Pacifica and San Jose Fire Departments and worked as a firefighter, fire engineer and fire captain. As fire captain, Dan spent many years at Fire Station 4 protecting the Burbank district of San Jose. Dan's firefighter training included incident command; fire suppression for structures, vehicles and grassland (including use and application of foam); search and rescue; ventilation operations; salvage and overhaul; and emergency medical training. He also received specialized training in high-rise fires, and low-angle rope rescue operations. Dan earned a Medal of Valor and the Firefighter of the Year for the rescue of a baby trapped in a burning second story bedroom which required searching for the baby without the protection of a hose line, and then descending the ladder with the uninjured baby in his arms. Dan also delivered four babies during his career. In the course of firefighting training and fire suppression activities, he routinely used Class B foam and wore turnouts that, unbeknownst to him contained PFAS or PFAS-containing materials. He was unaware that the Class B foam he used and the turnouts he wore contained PFAS or PFAS-containing materials. Blood serum testing conducted in July 2020 shows his PFAS levels are significantly elevated. Dan has been diagnosed with and treated for prostate cancer and tumors in his lymph nodes.

18.     Bob Bacon worked as a firefighter for over 28 years in the City of San Jose Fire Department, primarily serving at SJFD Fire Station 20, at the Norman Y. Mineta San Jose International Airport. Bob's firefighter training included incident command; fire suppression for structures, vehicles and grassland (including use and application of foam); search and rescue; ventilation operations; salvage and overhaul; and emergency medical training. He also received specialized training in ARFF. One of the most significant moments in Bob's career was when he responded to a medical emergency at the airport for a man who was in full cardiac arrest. Bob successfully resuscitated him; the man later visited the station to thank Bob for saving his life. He also delivered one baby during his career. In the course of firefighting training and fire suppression activities, Bob routinely used Class B foam and wore turnouts that, unbeknownst to him contained

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

PFAS or PFAS-containing materials. He was unaware that the Class B foam he used and the turnouts he wore contained PFAS or PFAS-containing materials. Blood serum testing conducted in July 2020 show his PFAS levels are significantly elevated. Bob has been diagnosed with and treated for prostate cancer.

19. John Castro worked for nearly 30 years in the City of San Jose Fire Department, working his way through the ranks from firefighter, fire engineer, and fire inspector to fire captain, spending many years working at SJFD Fire Station 6, serving the Willow Glen district of San Jose. John's firefighter training included incident command; fire suppression for structures, vehicles and grassland (including use and application of foam); search and rescue; ventilation operations; salvage and overhaul; and emergency medical training. He received specialized training in high-rise fires, and low-angle rope rescue operations, and has delivered three babies over his career. He has fought many fires, but one stands out for him: he and his crew extinguished a residential structure fire in south San Jose, and during the course of the fire fight, John was able to locate and rescue the family's dog, which had been burned and was struggling to breath, and was successfully able to resuscitate and save the family's beloved pet. For 18 years, John was on the organizing committee for the Firefighter Chili Cook-Off which raised over $2 million for the Santa Clara Valley Medical Burn Center. In the course of firefighting training and fire suppression activities, John routinely used Class B foam and wore turnouts that, unbeknownst to him contained PFAS or PFAS-containing materials. He was unaware that the Class B foam he used and the turnouts he wore contained PFAS or PFAS-containing materials. Blood serum testing conducted in July 2020 show his PFAS levels are significantly elevated. John has been diagnosed and treated for Chronic Lymphocytic Leukemia and kidney cancer.

20. Luis Chacon worked as a firefighter for over 25 years in the City of San Jose Fire Department, primarily SJFD Fire Station 1 ("The Market Street Zoo") one of the busiest fire stations in the United States. Luis' firefighter training included incident command; fire suppression for structures, vehicles and grassland (including use and application of foam); search and rescue; ventilation operations; salvage and overhaul; and emergency medical training. He received specialized training in high-rise fires, and low-angle rope rescue operations. Luis earned two Medals

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

of Valor for rescuing two adults trapped in a burning house, and for his work on a mutual-aid strike team for the Lick Fire, where he was on the fire line for six days and saved dozens of family homes and businesses. Luis also has delivered one baby during his career. In the course of firefighting training and fire suppression activities, Luis routinely used Class B foam and wore turnouts that, unbeknownst to him contained PFAS or PFAS-containing materials. He was unaware that the Class B foam he used and the turnouts he wore contained PFAS or PFAS-containing materials. Blood serum testing conducted in July 2020 show his PFAS levels are significantly elevated. Luis has been diagnosed with and treated for prostate cancer.

21.    Frank Diaz worked as a firefighter for 34 years in the City of Mountain View and the City of San Jose Fire Departments with the majority of his career at SJFD Fire Station 3, serving the Alma district of San Jose. Frank's firefighter training included incident command; fire suppression for structures, vehicles and grassland (including use and application of foam); search and rescue; ventilation operations; salvage and overhaul; and emergency medical training. He also received specialized training in high-rise fires, and low-angle rope rescue operations. In his long career, one of Frank's most memorable moments was responding to a medical call for an unresponsive middle-aged man who, when Frank arrived at the scene, had stopped breathing. Frank provided emergency life support and saved the man's life. At the other end of life's spectrum, Frank also has delivered two babies during his career. In the course of firefighting training and fire suppression activities, Frank routinely used Class B foam and wore turnouts that, unbeknownst to him contained PFAS or PFAS-containing materials. He was unaware that the Class B foam he used and the turnouts he wore contained PFAS or PFAS-containing materials. Blood serum testing conducted in July 2020 show his PFAS levels are significantly elevated. Frank has been diagnosed with and treated for prostate cancer.

22.    Felix Diaz worked as a firefighter for 25 years for the City of Santa Clara Fire Department at both engine and truck companies throughout the City of Santa Clara. Felix's firefighter training included incident command; fire suppression for structures, vehicles and grassland (including use and application of foam); search and rescue; ventilation operations; salvage and overhaul operations; and emergency medical training. In his long career, Felix responded to many emergencies.

- 9 -
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

One of Felix's most significant moments was rescuing a man involved in a vehicle accident on US 101 who, when Felix arrived at the scene, was in full traumatic arrest (no heartbeat and no respiratory activity). Though resuscitation success rates for full traumatic arrest are very low, Felix worked on the man for an hour until the man was finally resuscitated and responsive, saving the man's life. In the course of firefighting training and fire suppression activities, Felix routinely used Class B foam and wore turnouts that, unbeknownst to him contained PFAS or PFAS-containing materials. He was unaware that the Class B foam he used and the turnouts he wore contained PFAS or PFAS-containing materials. Blood serum testing conducted in July 2020 show his PFAS levels are significantly elevated. Felix has been diagnosed with and treated for prostate cancer.

23.     Paul Eden was in the fire service for over 32 years and spent 26 of those years in the City of San Jose Fire Department, working as a firefighter, fire engineer, fire inspector and fire captain. He spent the majority of his career working at Fire Station 26 ("The Night Train") one of San Jose's busiest stations serving central San Jose. Paul's firefighter training included incident command; fire suppression for structures, vehicles and grassland (including use and application of foam); search and rescue; ventilation operations; salvage and overhaul; and emergency medical training. He also received specialized training in high-rise fire operations, and low-angle rope rescue operations. In his long career, one call stands out and involved an approximately 400 lb. man who was in cardiac arrest (no heartbeat or respiratory activity) on the roof of a commercial building. Paul had to climb a ladder with approximately 60 lbs. of EMS gear and immediately begin working on resuscitating the man. Paul performed life-saving measures, the man's pulse returned, and Paul arranged to have the man transported on a stretcher by ladder from the roof to the ambulance. The man later visited the station to thank them for saving his life. Paul also delivered three babies during his career. In the course of firefighting training and fire suppression activities, Paul routinely used Class B foam and wore turnouts that, unbeknownst to him contained PFAS or PFAS-containing materials. He was unaware that the Class B foam he used and the turnouts he wore contained PFAS or PFAS-containing materials. Blood serum testing conducted in July 2020 show his PFAS levels are significantly elevated. Paul has been diagnosed with and treated for kidney cancer. In 2020, metastatic renal cell carcinoma tumors were found and removed from his right lung.

- 10 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

24. John Laurent worked for 34 years in the City of San Jose Fire Department as a firefighter, fire engineer and fire captain with the majority of his career working in downtown San Jose on Engine 30. John's firefighter training included incident command; fire suppression for structures, vehicles and grassland (including use and application of foam); search and rescue; ventilation operations; salvage and overhaul; and emergency medical training. He also received specialized training in high-rise fire operations and low-angle rope rescue operations. During his firefighting career, John received a Medal of Valor for rescuing five adults living in an old Victorian era home that were trapped by fire. He also delivered one baby during his career. John has continued to serve the community by teaching CPR for adults and infants. In the course of firefighting training and fire suppression activities, John routinely used Class B foam and wore turnouts that, unbeknownst to him contained PFAS or PFAS-containing materials. He was unaware that the Class B foam he used and the turnouts he wore contained PFAS or PFAS-containing materials. Blood serum testing conducted in July 2020 show his PFAS levels are significantly elevated. John has been diagnosed with and is being treated for Myelodysplastic Syndrome, a rare blood cancer that can also be a precursor to leukemia.

25. Larry Noon worked as a firefighter for 30 years in the City of San Jose Fire Department, spending many years at Fire Station 15 serving San Jose's west side neighborhoods. Larry's firefighter training included incident command; fire suppression for structures, vehicles and grassland (including use and application of foam); search and rescue; ventilation operations; salvage and overhaul; and emergency medical training. He also received specialized training in high-rise fires, and low angle rope rescue operations. One of the most significant moments in Larry's career happened when he responded to a medical emergency for a baby having seizures. At the scene, Larry found a panicked mother holding her seizing baby: Larry immediately provided medical care which stopped the seizures and comforted the baby's distressed family. He also assisted in the delivery of two babies during his career. In the course of firefighting training and fire suppression activities, Larry routinely used Class B foam and wore turnouts that, unbeknownst to him contained PFAS or PFAS-containing materials. He was unaware that the Class B foam he used and the turnouts he wore contained PFAS or PFAS-containing materials. Blood serum testing conducted in July 2020 show his

- 11 -
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

PFAS levels are significantly elevated. Larry has been diagnosed with and treated for bladder cancer.

26.     Rob Piper has worked in the fire service for 35 years, with 28 of those years serving in the City of San Jose Fire Department as a firefighter, fire captain, battalion chief, and deputy chief. Rob spent many years working on SJFD Engine 26, "The Night Train." His firefighter training included incident command; fire suppression for structures, vehicles and grassland (including use and application of foam); search and rescue; ventilation operations; salvage and overhaul; and emergency medical training. He also received specialized training in high-rise fire operations, low-angle rope rescue operations, and fire administration. Rob received the Firefighter of the Year award from the City of San Jose, a commendation for bravery from the State of California and County of Santa Clara, and a commendation for bravery from the City of San Jose for saving a fellow firefighter who fell through a floor into a burning basement during a house fire with high heat and zero visibility in San Jose's Willow Glen district. Rob also delivered six babies during his career. In the course of firefighting training and fire suppression activities, he routinely used Class B foam and wore turnouts that, unbeknownst to him contained PFAS or PFAS-containing materials. He was unaware that the Class B foam he used and the turnouts he wore contained PFAS or PFAS-containing materials. Blood serum testing conducted in July 2020 show his PFAS levels are significantly elevated. Rob has been diagnosed with and treated for transverse colon cancer.

27.     Steve Pizzo worked for 25 years in the City of San Jose Fire Department as a firefighter, fire engineer and fire captain, spending many years working at SJFD Fire Station 5 serving San Jose's Japantown District. Steve's firefighter training included incident command; fire suppression for structures, vehicles and grassland (including use and application of foam); search and rescue; ventilation operations; salvage and overhaul; and emergency medical training. He also received specialized training in ARFF, high-rise fire operations, and low-angle rope rescue operations. Steve received a commendation from SJFD Fire Chief Osby for his life-saving actions taken, while off-duty, when he assisted a severely injured motorcycle rider who had been thrown 50 feet over a steep embankment, fracturing his leg and rendering him unconscious. Steve provided scene control, cervical stabilization, and constructed a make-shift splint from branches and a belt stabilizing the leg fracture, all the while providing comfort and support to the injured rider until

- 12 -
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

emergency responders arrived and took over patient care. Steve also delivered two babies during his career. In the course of firefighting training and fire suppression activities, he routinely used Class B foam and wore turnouts that, unbeknownst to him contained PFAS or PFAS-containing materials. He was unaware that the Class B foam he used and the turnouts he wore contained PFAS or PFAS-containing materials. Blood serum testing conducted in July 2020 show his PFAS levels are significantly elevated. Steve has been diagnosed with and treated for papillary thyroid cancer.

28.     Moses Salas has been a CAL Fire firefighter and paramedic, and a firefighter/paramedic in the City of San Jose Fire Department for 12 years. He currently works at SJFD Fire Station 17 serving the Blossom Hill district of San Jose. Moses' firefighter training included incident command; fire suppression for structures, vehicles and grassland (including use and application of foam); search and rescue; ventilation operations; salvage and overhaul; emergency medical training; advanced cardiac life support; and pediatric advanced life support. One of Moses's most memorable calls was a medical emergency for an unresponsive father of two girls. When he arrived, the girls said their father was dead. Moses assessed the man for cardiac arrhythmia and treated him with electrical defibrillation to return his heartrate to a normal heat beat and then gave him advanced life support. The man responded and survived this harrowing event. Moses has also delivered one baby during his career. In the course of firefighting training and fire suppression activities, he routinely used Class B foam and wore turnouts that, unbeknownst to him, contained PFAS or PFAS-containing materials. He was unaware that the Class B foam he used and the turnouts he wore contained PFAS or PFAS-containing materials. Blood serum testing conducted in July 2020 show his PFAS levels are significantly elevated. Moses has been diagnosed with and treated for testicular cancer.

29.     Mike Sanchez was in the fire service for over 25 years in the City of San Jose Fire Department, working as a firefighter, fire engineer, and fire inspector. He spent many years working at SJFD Fire Station 14 serving San Jose's Westgate district. His firefighter training included incident command; fire suppression for structures, vehicles and grassland (including use and application of foam); search and rescue; ventilation operations; salvage and overhaul; and emergency medical training. Mike also received specialized training in high-rise fires, and low-angle rope rescue

- 13 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

operations. Mike was recognized by the San Jose Rotary Club for his act of heroism, while off-duty, after he noticed a growing column of thick black smoke rising from a nearby apartment complex while driving to work. Mike followed the smoke column and discovered an apartment building on fire. He entered the burning apartment building to help the residents – including a mother and daughter unaware of the fire in their kitchen— exit the building to safety while Mike extinguished the fire. Mike also delivered two babies during his career. In the course of firefighting training and fire suppression activities, Mike routinely used Class B foam and wore turnouts that, unbeknownst to him, contained PFAS or PFAS-containing materials. He was unaware that the Class B foam he used and the turnouts he wore contained PFAS or PFAS-containing materials. Blood serum testing conducted in July 2020 show his PFAS levels are significantly elevated. Mike has been diagnosed with and treated for colon cancer.

30.     Ed Solano worked as a firefighter and fire engineer for over 30 years in the City of San Jose Fire Department in SJFD's Truck 9 serving the Cambrian Park district of San Jose. Ed's firefighter training included incident command; fire suppression for structures, vehicles and grassland (including use and application of foam); search and rescue; ventilation operations; salvage and overhaul; and emergency medical training. He also received specialized training in high-rise fires and low-angle rope rescue operations. One of Ed's most memorable calls was while working on SJFD Truck 9, when he fought a multiple alarm fire at a historical winery in south San Jose, where he and other firefighters successfully saved many historical landmarks and artifacts. In the course of firefighting training and fire suppression activities, Ed routinely used Class B foam and wore turnouts that, unbeknownst to him, contained PFAS or PFAS-containing materials. He was unaware that the Class B foam he used and the turnouts he wore contained PFAS or PFAS-containing materials. Blood serum testing conducted in July 2020 show his PFAS levels are significantly elevated. Ed has been diagnosed with and treated for prostate cancer.

31.     Marc Stelling has been in the fire service for 32 years in the Gilroy Fire Department, serving as a volunteer firefighter, firefighter, fire engineer, and fire captain. Marc is currently working on Gilroy Engine 49 serving the Sunrise district of Gilroy. His firefighter training included incident command; fire suppression for structures, vehicles and grassland (including use and application of

foam); search and rescue; ventilation operations; salvage and overhaul; and emergency medical training. He also has received specialized training in low-angle rope rescue operations. As a captain, Marc goes to every single call to ensure the safety of his crew; he never sends his firefighters into dangerous situations unless he is with them. He received a commendation for his work on the Croy Fire in the Santa Cruz Mountains in which he had arrived at a small, rural housing development surrounded by a fast-approaching wildland fire and found that the pump for the 10,000-gallon water tank was broken. Though the area had been evacuated and the fire was threatening structures, Marc managed to fix the water pump under extreme weather and fire conditions and save four homes. Recently, Marc was deployed to fight fires and protect structures in the LNU Lighting Complex fires. In the course of firefighting training and fire suppression activities, Marc routinely used Class B foam and wore turnouts that, unbeknownst to him, contained PFAS or PFAS-containing materials. He was unaware that the Class B foam he used and the turnouts he wore contained PFAS or PFAS-containing materials. Blood serum testing conducted in July 2020 show his PFAS levels are significantly elevated. Marc has been diagnosed with and treated for kidney cancer.

32.     Mike Tallerico worked as a firefighter and fire engineer for 22 years in the City of San Jose Fire Department on SJFD Engine 8 and Engine 14, serving San Jose's downtown and westside neighborhoods. Mike's firefighter training included incident command; fire suppression for structures, vehicles and grassland (including use and application of foam); search and rescue; ventilation operations; salvage and overhaul; and emergency medical training. He also received specialized training in ARFF, high-rise fires, and low-angle rope rescue operations. In his long career, one of Mike's most memorable moments was responding to a medical incident for an unresponsive man at a bank on Saratoga Ave. When Mike arrived, the man was in full cardiac arrest (no pulse and not breathing); Mike immediately began providing life support measures and the man survived. Mike also delivered three babies during his career. In the course of firefighting training and fire suppression activities, Mike routinely used Class B foam and wore turnouts that, unbeknownst to him, contained PFAS or PFAS-containing materials. He was unaware that the Class B foam he used and the turnouts he wore contained PFAS or PFAS-containing materials. Blood serum testing conducted in July 2020 show his PFAS levels are significantly elevated. Mike has been diagnosed with and treated for bladder

- 15 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

cancer.

33.     Mike Tapia worked for 27 years in the City of San Jose Fire Department as a firefighter, fire paramedic, and provisional fire engineer, spending many years working at SJFD Engine Companies 4 and 24, which serve San Jose's Burbank and Evergreen neighborhoods. Mike's firefighter training included incident command; fire suppression for structures, vehicles and grassland (including use and application of foam); search and rescue; ventilation operations; salvage and overhaul; and emergency medical training. He also received specialized training in advanced cardiac life support, pediatric advanced life support, high-rise fires, and low-angle rope rescue operations. Mike earned two Medals of Valor and a service award. His most significant call was a response to a medical emergency, where he rescued a child who had drowned and was unconscious. Mike performed life saving measures and the child survived. He also delivered three babies during his career. In the course of firefighting training and fire suppression activities, Mike routinely used Class B foam and wore turnouts that, unbeknownst to him, contained PFAS or PFAS-containing materials. He was unaware that the Class B foam he used and the turnouts he wore contained PFAS or PFAS-containing materials. Blood serum testing conducted in July 2020 show his PFAS levels are significantly elevated. Mike has been diagnosed with and treated for essential thrombocythemia, a rare blood cancer.

34.     Eunico ("Nick") Trinidad has worked as a firefighter paramedic for 13 years in the City of San Jose Fire Department. Currently, he is assigned to SJFD Truck 35 serving the Edendale district of San Jose. Nick's firefighter training included incident command; fire suppression for structures, vehicles and grassland (including use and application of foam); search and rescue; ventilation operations; salvage and overhaul; and emergency medical training. He has also received specialized training in advance cardiac life support, pediatric advanced life support, high-rise fires, and low-angle rope rescue operations. One of Nick's most memorable calls was for a vehicle accident involving a young woman who was trapped in a crushed automobile and had a steel rod impaled through her leg. A field surgeon was on route to the scene to amputate her leg. Working quickly with the "jaws of life", Nick was able to free her. The woman survived and did not have to have her leg amputated. Nick also has the distinction of having delivered more than 25 babies during his career.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

In the course of firefighting training and fire suppression activities, Nick routinely used Class B foam and wore turnouts that, unbeknownst to him, contained PFAS or PFAS-containing materials. He was unaware that the Class B foam he used and the turnouts he wore contained PFAS or PFAS-containing materials. Blood serum testing conducted in July 2020 show his PFAS levels are significantly elevated. Nick has been diagnosed with and treated for a rare salivary gland cancer.

35.     George Vega has worked in the fire service for 32 years in the Redwood City Fire Department and the City of San Jose Fire Department as a firefighter, fire engineer, fire captain and battalion chief, with the majority of his career working at SJFD Fire Station 1 serving downtown San Jose. George's firefighter training included incident command; fire suppression for structures, vehicles and grassland (including use and application of foam); search and rescue; ventilation operations; salvage and overhaul; and emergency medical training. He also received specialized training in high-rise fire operations, low-angle rope rescue operations, and fire administration. As a battalion chief, George was responsible for 6-8 stations, as well as strategic command and tactical operations for hazmat incidents, multiple vehicle accidents, and any fires over 1-alarm, including the notorious Santana Row Fire and the Unity Church fire near St. James Park, where George commanded the 4-alarm fire responsible for 50 firefighters saving the beloved church. In the course of firefighting training and fire suppression activities, George routinely used Class B foam and wore turnouts that, unbeknownst to him, contained PFAS or PFAS-containing materials. He was unaware that the Class B foam he used and the turnouts he wore contained PFAS or PFAS-containing materials. Blood serum testing conducted in July 2020 show his PFAS levels are significantly elevated. George has been diagnosed with and is currently being treated for prostate cancer.

36.     William ("Bruce") Staples worked in the fire service for 30 years in the City of San Jose Fire Department as a firefighter, fire engineer, fire prevention inspector, fire captain, battalion chief, deputy fire chief, assistant fire chief, and acting fire chief. Bruce spent many years working at Fire Station 13 serving the Santa Teresa district of San Jose. His firefighter training included incident command; fire suppression for structures, vehicles and grassland (including use and application of foam); search and rescue; ventilation operations; salvage and overhaul; and emergency medical training. He also received specialized training in high-rise fire operations, and fire administration.

- 17 -
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Bruce's most significant contribution to the SJFD and the City of San Jose was overseeing the development and implementation of SJFD's paramedic program, which provided staffing of a cross-trained firefighter/paramedic at every engine and truck company in the City. In the course of firefighting training and fire suppression activities, Bruce routinely used Class B foam and wore turnouts that, unbeknownst to him, contained PFAS or PFAS-containing materials. He was unaware that the Class B foam he used and the turnouts he wore contained PFAS or PFAS-containing materials. Blood serum testing conducted in July 2020 show his PFAS levels are significantly elevated. Bruce has been diagnosed with and treated for kidney cancer, and is currently being treated for cancerous nodules in his lungs.

37.     The Firefighter Plaintiffs, individually and collectively, allege that PFAS or PFAS-containing materials developed, manufactured, marketed distributed, released, sold, and/or used by Defendants in Class B foam and turnouts, as herein alleged, caused them to be exposed to PFAS and/or PFAS-containing materials. Such exposure was a substantial factor and proximate cause of the cancers, serious illnesses and bodily injuries suffered by the Firefighter Plaintiffs, as alleged herein.

**B.     The Spouse Plaintiffs**

38.     Bridget Tapia is the spouse of Firefighter Plaintiff Mike Tapia. Bridget and Mike were lawfully married at all times relevant to this action, and now are husband and wife.

39.     Victoria Bebee is the spouse of Firefighter Plaintiff Kevin Bebee. Victoria and Kevin were lawfully married at all times relevant to this action, and now are husband and wife.

40.     Kathy Piper is the spouse of Firefighter Plaintiff Rob Piper. Kathy and Rob were lawfully married at all times relevant to this action, and now are husband and wife.

**Defendants**

41.     Defendant 3M Company (a/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation that does business throughout the United States, including conducting business in California. 3M has its principal place of business in St. Paul, Minnesota. 3M developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the

- 18 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

County of Santa Clara.

42. Defendant E. I. du Pont de Nemours & Co. ("DuPont") is a Delaware corporation that does business throughout the United States, including conducting business in California. DuPont has its principal place of business in Wilmington, Delaware. DuPont developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the County of Santa Clara.

43. Defendant The Chemours Company, L.L.C. ("Chemours") is a Delaware corporation that does business throughout the United States, including conducting business in California. Chemours has its principal place of business in Wilmington, Delaware. Chemours developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the County of Santa Clara.

44. Defendant Archroma U.S., Inc. ("Archroma") is a North Carolina corporation that does business throughout the United States, including conducting business in California. Archroma has its principal place of business in Charlotte, North Carolina. Archroma developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the County of Santa Clara.

45. Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation that does business throughout the United States, including conducting business in California. Arkema has its principal place of business in King of Prussia, Pennsylvania. Arkema developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the County of Santa Clara.

46. Defendant AGC Chemicals Americas, Inc. ("AGC") is a Delaware corporation that does business throughout the United States, including conducting business in California. AGC has its principal place of business in Exton, Pennsylvania. AGC developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the County of Santa Clara.

47. Defendant Daikin America, Inc. ("Daikin America") is a Delaware corporation that

- 19 -
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

does business throughout the United States, including conducting business in California. Daikin America has its principal place of business in Orangeburg, New York. Daikin America developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the County of Santa Clara.

48.     Defendant Solvay Specialty Polymers, USA, L.L.C. ("Solvay") is a Delaware corporation that does business throughout the United States, including conducting business in California. Solvay has its principal place of business in Alpharetta, Georgia. Solvay developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the County of Santa Clara.

49.     Defendant Dynax Corporation ("Dynax") is a New York corporation that does business throughout the United States, including conducting business in California. Dynax has its principal place of business in Pound Ridge, New York. Dynax developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the County of Santa Clara.

50.     Defendant Johnson Controls, Inc. ("Johnson Controls") is a Delaware corporation that does business throughout the United States, including conducting business in California. Johnson Controls has its principal place of business in Milwaukee, Wisconsin. Johnson Controls is the parent of Defendants Tyco Fire Products, LP and Chemguard, Inc. Johnson Controls developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the County of Santa Clara.

51.     Defendant Tyco Fire Products, L.P. ("Tyco") is a Delaware corporation that does business throughout the United States, including conducting business in California. Tyco has its principal place of business in Exeter, New Hampshire. Tyco developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the County of Santa Clara.

- 20 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

52.     Defendant Chemguard, Inc. ("Chemguard") is a Wisconsin corporation that does business throughout the United States, including conducting business in California. Chemguard has its principal place of business in Marinette, Wisconsin. Chemguard developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the County of Santa Clara.

53.     Defendant National Foam, Inc., ("National Foam") is a Pennsylvania corporation that does business throughout the United States, including conducting business in California. National Foam has its principal place of business in West Chester, Pennsylvania. National Foam developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the County of Santa Clara.

54.     Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation that does business throughout the United States, including conducting business in California. Carrier has its principal place of business in Palm Beach Gardens, Florida. Carrier is the parent of Defendant Kidde-Fenwal, Inc. Carrier developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the County of Santa Clara.

55.     Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a Delaware corporation that does business throughout the United States, including conducting business in California. Kidde-Fenwal has its principal place of business in Ashland, Massachusetts. Kidde-Fenwal developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the County of Santa Clara.

56.     Defendant Kidde Fire Fighting Inc., ("Kidde") is a Pennsylvania corporation that does business throughout the United States, including conducting business in California. Kidde has its principal place of business in Exton, Pennsylvania. Kidde developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the County of Santa Clara.

- 21 -
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

57.     Defendant Perimeter Solutions, LP, ("Perimeter Solutions") is a Delaware corporation that does business throughout the United States, including conducting business in California. Perimeter Solutions has a principal place of business in Rancho Cucamonga, California. Perimeter developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the County of Santa Clara.

58.     Defendant Fire Service Plus, Inc. ("Fire Service Plus") is a Georgia corporation that does business throughout the United States, including conducting business in California. Fire Service Plus has its principal place of business in Simi Valley, California. Fire Service Plus developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the County of Santa Clara.

59.     Defendant Buckeye Fire Equipment ("Buckeye") is a North Carolina corporation that does business throughout the United States, including conducting business in California. Buckeye has its principal place of business in Kings Mountain, North Carolina. Buckeye developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the County of Santa Clara.

60.     Defendant Amerex Corporation, also known as Alabama Amerex Corporation, ("Amerex") is an Alabama corporation that does business throughout the United States, including conducting business in California. Amerex has its principal place of business in Trussville, Alabama. Amerex developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the County of Santa Clara.

61.     Defendant MSA Safety, Inc., ("MSA") is a Pennsylvania corporation that does business throughout the United States, including conducting business in California. MSA has its principal place of business in Cranberry Township, Pennsylvania. MSA acquired Globe Holding Company, LLC and its subsidiaries (collectively, "Globe") in 2017 and continues to do business

- 22 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

under the Globe name. MSA developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the County of Santa Clara.

62.    Defendant Lion Group, Inc., ("Lion") is an Ohio corporation that does business throughout the United States, including conducting business in California. Lion has its principal place of business in Dayton, Ohio. Lion developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the County of Santa Clara.

63.    Defendant W. L. Gore & Associates, Inc., ("Gore") is a Delaware corporation that does business throughout the United States, including conducting business in California. Gore has its principal place of business in Newark, Delaware. Gore developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the County of Santa Clara.

64.    Defendant Royal Ten Cate US, Inc. ("Tencate") is a Delaware corporation that does business throughout the United States, including conducting business in California. Tencate has its principal place of business in Pendergrass, Georgia. Tencate developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the County of Santa Clara.

65.    Defendant PBI Performance Products, Inc., ("PBI") is a Delaware corporation that does business throughout the United States, including conducting business in California. PBI has its principal place of business in Charlotte, North Carolina. PBI developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the County of Santa Clara.

66.    Defendant L.N. Curtis & Sons ("LN Curtis") is a California corporation that does business in California. LN Curtis has its principal place of business is Walnut Creek, California. LN Curtis developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the County of Santa Clara.

- 23 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

67.     Defendant AllStar Fire Equipment ("AllStar") is a California corporation that does business in California. AllStar has its principal place of business in Arcadia, California. AllStar developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts, including in California and in the County of Santa Clara.

68.     Plaintiffs are currently unaware of the true names and capacities of Defendants named herein as DOES 1 through 25, inclusive, and Plaintiffs therefore sue those Defendants by fictitious names pursuant to California Code of Civil Procedure § 474. Plaintiffs will amend this complaint to state the true names and capacities of those Defendants sued herein as DOES when ascertained. Plaintiffs allege that each fictitiously named Defendant is in some manner responsible for the acts alleged herein and that they proximately caused the injuries to Plaintiffs as alleged herein.

69.     Defendants DOES 1 through 25 are subsidiaries, partners, or other entities that were involved in the design, development, manufacture, testing, packaging, promotion, marketing, advertising, distribution, labeling, and/or sale of PFAS, PFAS materials, and products containing PFAS in the Class B foam and/or turnouts that Firefighter Plaintiffs used, as alleged herein.

70.     Plaintiffs allege that each named Defendant is in some manner responsible for the acts alleged herein and that they proximately caused the injuries to Plaintiffs, as alleged herein.

71.     Plaintiffs allege that each named Defendant derived substantial revenue from the PFAS, PFAS materials, and products containing PFAS in Class B foams and/or turnouts that Defendants designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, labeled and/or sold within California, and that were used by Firefighter Plaintiffs herein within Santa Clara County, California.

72.     Defendants expected or should have expected their acts to have consequences within the State of California, and derived substantial revenue from interstate commerce.

73.     Defendants purposefully availed themselves of the privilege of conducting activities within the State of California, thus invoking the benefits and protections of its laws.

## JURISDICTION AND VENUE

74.     This Court has jurisdiction over this action under California Code of Civil Procedure

- 24 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

§ 410.10 and Article VI, § 10 of the California Constitution. The injuries and damages alleged herein are in an amount within the jurisdiction of this Court.

75. The Firefighter Plaintiffs' exposure and Plaintiffs' injuries, resulting from the acts of Defendants alleged herein, occurred in Santa Clara County, California. Venue is proper is this Court under California Code of Civil Procedure § 395(a).

## SUBSTANTIVE ALLEGATIONS

**A.   The Firefighters Plaintiffs' Use of and Exposure to PFAS-Containing Products**

76. The Firefighter Plaintiffs are 24 firefighters who have served the San Jose, Santa Clara and Gilroy communities and worked in various fire stations and engine companies in the County of Santa Clara for decades.[4]

77. As first responders to fire, hazardous materials incidents, and other emergency and medical calls, the Firefighter Plaintiffs risk their lives on a daily basis. They not only save lives and homes, they provide emergency services and medical care, perform rescues, and offer support to people in traumatic circumstances. To prepare them for this enormously challenging work, the Firefighter Plaintiffs receive extensive and ongoing training in fire suppression (including the preparation and use of Class B foam), fire prevention, rescue, and emergency medical care action to protect and/or minimize the loss of life, property, and damage to the environment.

78. The City of San Jose Fire Department protects over one million residents and 200 square miles in the third largest city in California and the tenth largest city in the nation. The SJFD is also the emergency service provider for many high-hazard occupancies, including the Norman Y. Mineta San Jose International Airport; a municipal airport; 7 major hospitals (including 3 trauma centers, and 7 emergency departments); the SAP Center, and home to the NHL San Jose Sharks; San Jose State University (which has a student population of 31,906); three regional super malls; and over 516 high-rise structures.[5] In 2017-2018, the SJFD responded to 94,500 calls.

79. The City of Santa Clara Fire Department ("SCFD") serves 175,000 residents, and

---

[4] Three of these firefighters' spouses, referred to collectively herein as Spouse Plaintiffs, independently assert claims for loss of consortium as detailed more fully at ¶¶ 247-252, below.

[5] San Jose Fire Department Website, (last visited September 7, 2020), https://sjff.org/sjfd.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

responds to over 9,000 calls a year, protecting a wide array of occupancies including Silicon Valley businesses, Levi's Stadium, Santa Clara University, Mission College, the Santa Clara Convention Center, Westfield Valley Fair Mall, and several high-rise hotels, as well as being at the intersection of several main freeways. The SCFD also provides mutual aid response annually for local and regional wildfires across California by staffing three fire engines designated for this response.

80.     The City of Gilroy Fire Department ("GFD") serves a tight-knit community of 55,000 people and responds to over 5,500 calls a year with just 35 full-time firefighters.

81.     For decades, Defendants, either individually or through their predecessors or subsidiaries, have manufactured, designed, sold, supplied, and distributed chemical feedstock and/or Class B foam and turnouts containing PFAS to firefighting training facilities and fire departments globally, including within the State of California and the cities of San Jose, Santa Clara and Gilroy, California.

82.     With over 5,000 individual chemicals, PFAS is a large and ever-growing category of human-made chemicals, consisting of a nearly indestructible chain of carbon and fluorine atoms that are widely used in products to, *inter alia*, resist and repel oil, heat and water, and have been found to have negative health effects.  As detailed below, these toxic chemicals are present in Class B foam and firefighter turnouts.

### (1)     PFAS-Containing Class B Foam

83.     Class B foam is one of the primary tools used by firefighters for fire suppression and is particularly effective for extinguishing fires involving oil and/or chemicals common at transportation accidents, aircraft accidents, chemical spills, and Hazmat incidents.  Class B foam is also used in structural or other types of non-chemical fires when water cannot penetrate deeply enough to ensure that unseen fire is extinguished.  The most common Class B foam is aqueous film-forming foam ("AFFF").  AFFF and other Class B foams contain PFAS.

84.     To use Class B foam, a Class B foam concentrate must first be mixed with water.

85.     Class B foam concentrate is typically sold in five-gallon containers that a fire

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

engineer[6] is responsible for storing on the engine and/or pouring into the bladder of engine. To mix the foam concentrate and water in an engine that is not pre-plumbed, an eductor must be placed in the foam concentrate to draw up the concentrate and mix it with water to create a thick, white, foamy substance. The fire engineer is responsible for this process of preparing the foam and for cleaning the equipment (bladders, hoses, nozzles, etc.) after use.

86.     The process of mixing Class B foam, plumbing and preparing it, and cleaning the equipment after foam use causes exposure to PFAS through skin contact, inhalation, or ingestion (e.g., hand-to-mouth contact). The Class B foam containers used by the Firefighter Plaintiffs and their fire departments to mix and prepare the Class B foam for use did not say that the foam contains PFAS, and did not warn the Firefighter Plaintiffs of the serious health risks associated with exposure to PFAS.

87.     Class B foam is used in fire extinguishment in a manner typical of routine methods of fire extinguishment—by being sprayed through a fire hose.

88.     The techniques used for "laying a blanket" of Class B foam in fire extinguishment include: banking the foam off a wall or vertical surface to agitate the foam before it covers the fire; or applying it to the ground surface where the fire is burning. In structure fires, it can also be necessary to spray the ceilings, walls and floors. Reapplication of foam is often necessary because the foam blanket will break down over time.

89.     These techniques are used routinely in firefighting training as well as in real-world fire extinguishment, and result in firefighters being sprayed or entirely soaked with Class B foam, walking in and through Class B foam (which can reach thigh- or even waist-high), or kneeling in Class B foam during use – all as depicted in the exemplar photographs below. As a result, the techniques cause exposure to PFAS through skin contact, inhalation, or ingestion (e.g., hand-to-mouth contact).

---

[6] Fire engineers are typically responsible for firefighting vehicles, such as fire engines, that transport firefighters, carry equipment and pump water at fire scenes.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF





COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF





90.     As alleged herein, the Firefighter Plaintiffs use or used Class B foam in the ordinary course of performing their duties as it was intended to be used and in a foreseeable manner which exposed them to significant levels of PFAS.

91.     The Firefighter Plaintiffs did not know, and in the exercise of reasonable diligence, could not have known that the Class B foam they used in the course of performing their duties contained PFAS or PFAS-containing materials, and similarly did not know and could not have known that they routinely suffered exposure to PFAS or PFAS-containing materials in the Class B foam they

- 29 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

used in performing their duties.

92. These exposures to PFAS or PFAS-containing materials resulted in serious and life-threatening diseases to the Firefighter Plaintiffs, and continue to pose a significant health threat to them given the bioaccumulation, pervasiveness and persistence of PFAS.

### (2) PFAS-Containing Turnout Gear

93. During firefighting training and when responding to fires and performing fire extinguishment, firefighters wear turnouts that provide a degree of thermal, chemical, and biological protection for a firefighter. Turnout gear components include a helmet, hood, jacket, pants, boots, and gloves. Each component is made of an outer layer, as well as several inner layers that include a moisture barrier and thermal liner to protect the firefighter from ambient heat.[7]

94. PFAS chemicals are used in turnout gear to impart heat, water, and stain resistance to the outer shell of turnout gear. Due to exposure to heat, these chemicals off-gas, break down, and degrade. During the process, firefighters are exposed to PFAS chemicals contained in turnout gear, including through skin contact/absorption or ingestion (e.g., hand-to-mouth contact).[8]

95. A June 2020 study of turnout gear by researchers at the University of Notre Dame analyzed 30 new and used turnout jackets and pants originally marketed, distributed and sold in 2008, 2014, and 2017, by six turnout gear makers, including Defendants MSA (under the Globe name) and Lion, and found high levels of PFAS in turnout gear worn, used, or handled by firefighters, including the Firefighter Plaintiffs.

96. As alleged herein, the Firefighter Plaintiffs wear or wore turnouts in the ordinary course of performing their duties, as the turnouts were intended to be used and in a foreseeable manner, which exposed them to significant levels of PFAS.

97. The Firefighter Plaintiffs did not know, and in the exercise of reasonable diligence

---

[7] *What Materials Go Into Making Turnout Gear?*, Globe MSA Safety Website, (last visited September 7, 2020), https://globe.msasafety.com/selecting-your-gear/materials.

[8] Peaslee, Graham, *et al.,* "Another Pathway for Firefighter Exposure to Per- and Polyfluoroalkyl Substances: Firefighter Textiles, *Environmental Science & Technology Letters* 2020, 7, 8, 594-599 (Ecotoxicology and Public Health) (June 23, 2020) (hereinafter, "the Notre Dame Turnout Study").

- 30 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

could not have known, that the turnouts they wore or used in the course of performing their duties contained PFAS or PFAS-containing materials, and similarly did not know and could not have known that they routinely suffered exposure to PFAS or PFAS-containing materials in the turnouts they wore or used in performing their duties. The turnout gear worn or used by the Firefighter Plaintiffs did not and does not contain labeling information saying that the gear contains PFAS, and similarly did not and does not warn the Firefighter Plaintiffs of the health risks associated with exposure to PFAS.

98.    Like many fire departments across the country, the Firefighter Plaintiffs only had one set of turnouts to wear until the mid-2000s, when some were issued a second set of turnouts. For years and, indeed, throughout the majority of their careers, the Firefighter Plaintiffs took their turnouts home and cleaned them in their home washing machines – unknowingly exposing their spouses, children and home to the highly mobile and pernicious PFAS chemicals contained in and on Firefighter Plaintiffs' turnout gear.

**B.    The Chemical Structure of PFAS Makes Them Harmful to Human Health**

99.    PFAS are known as "forever chemicals" because they are immune to degradation, bio-accumulate in individual organisms and humans, and increase in concentration up the food chain.[9] Indeed, scientists are unable to estimate an environmental half-life (i.e. the time it takes for 50% of the chemical to disappear) for PFAS.[10] Even worse, some PFAS chemicals degrade into different PFAS chemicals.

100.    PFAS are nearly indestructible and are highly transportable.[11] PFAS exposure to humans can occur through inhalation, ingestion, or dermal contact.[12]

101.    PFAS chemicals include "older" long-chain PFAS like PFOA, PFOS, and PFNA that have eight or more carbon atoms, and "newer" short-chain PFAS, like PFBA, PFBS, PFHxA, and

---

[9] *Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS)*, National Institute of Environmental Health Sciences (last visited September 7, 2020), https://www.niehs.nih.gov/health/topics/agents/pfc/index.cfm.
[10] *Id.*
[11] *Toxicological Profile for Perfluoroalkyls, see* Relevance to Public Health, Agency for Toxic Substances & Disease Registry, (last visited September 7, 2020), https://www.atsdr.cdc.gov/toxprofiles/tp.asp?id=1117&tid=237.
[12] *Id.* at Health Effects pg. 439-440.

- 31 -
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

PFHxS. The PFAS chemical industry has repeatedly asserted that short-chain PFAS are safer and bio-degrade more easily than long-chain PFAS. However, recent scientific research conducted in 2020 shows that short-chain PFAS are in fact extremely persistent, highly mobile and transportable, almost impossible to remove from water, bio-accumulate in humans and the environment, and show similar toxicity as long-chain PFAS.[13]

102.    To date, there is no safe, acceptable or "normal" level of PFAS in the human body. Further, the fact that PFOA, PFOS, PFHxS, PFHpA, and PFNA are often found together presents a substantial risk to human health.

103.    PFAS exposure affects nearly every system in the body.[14] It has been associated with multiple and serious adverse health effects in humans including, but not limited to, cancer, liver damage, immune system and endocrine disorders, thyroid disease, ulcerative colitis, birth defects, decreased fertility, pregnancy-induced hypertension, accelerated changes in gene expression, and increases in oxidative stress which can contribute to DNA changes, tumor promotion, and other health conditions.[15]  It has also been found to concentrate in human blood, bones and organs.[16]

---

[13] Cheryl Hogue, *Short-chain and long-chain PFAS show similar toxicity, US National Toxicology Program says*, Chemical and Engineering News, (August 24, 2019), https://cen.acs.org/environment/persistent-pollutants/Short-chain-long-chain-PFAS/97/i33; David Andrews, PhD, *FDA Studies: 'Short-Chain' PFAS Chemicals More Toxic Than Previously Thought*, Environmental Working Group (March 9, 2020), https://tinyurl.com/y3lbq7by; Brendel, Stephan et al. *Short-chain perfluoroalkyl acids: environmental concerns and a regulatory strategy under REACH*, Environmental Sciences Europe, Vol. 30,1 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5834591/; Tom Neltner, *The Elephant in the Room: Potential Biopersistence of Short-Chain PFAS*, Environmental Defense Fund, (February 20, 2019), http://blogs.edf.org/health/2019/02/20/potential-biopersistence-short-chain-pfas/.
[14] Kelly Lenox, *PFAS Senate Hearing, Birnbaum's Expert Scientific Testimony*, Environmental Factor, National Institute of Environmental Health Sciences (May 2019), https://factor.niehs.nih.gov/2019/5/feature/1-feature-pfas/index.htm.
[15] Koskela, A. et al., *Perfluoroalkyl substances in human bone: concentrations in bones and effects on bone cell differentiation*, Scientific Reports, (July 28, 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5533791/pdf/41598_2017_Article_7359.pdf; *National Toxicology Program Technical Report on the Toxicology and Carcinogenesis Studies of Perfluorooctanoic Acid Administered in Feed to Sprague Dawley (Hsd: Sprague Dawley SD) Rats*, National Toxicology Program, (May 2020), https://ntp.niehs.nih.gov/ntp/htdocs/lt_rpts/tr598_508.pdf.
[16] *Id*. at fn. 15 (Koskela study).

- 32 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

**C.  Defendants Knowingly Manufactured, Developed, Marketed, Distributed, Supplied and/or Sold Toxic PFAS and/or Products Containing PFAS**

104.  Defendants have each marketed, developed, distributed, sold, promoted, manufactured, released, or otherwise used PFAS chemicals in products, including in PFAS-containing Class B foam and turnout gear, throughout the United States and in California.

105.  PFAS were first developed in the 1930s and 1940s. Soon after, 3M began manufacturing a PFAS material called perfluorooctanoic acid ("PFOA"), selling it to other companies, including DuPont.

106.  By the 1950s, PFAS were widely used in large-scale manufacturing.  Prior to this, PFAS had never been detected in nor were present in human blood or bodies.

107.  In the 1960s, Class B foam containing PFAS entered the global market and became the primary firefighting foam all over the world, with 3M as one of the largest manufacturers.

108.  In the 1970s, Defendants National Foam and Tyco began to manufacture, market and sell Class B foam containing PFAS, followed by Defendants Chemguard and Dynax in the 1990s, and Defendant Buckeye in the 2000s.

109.  Founded in 1918, Defendant MSA (under the Globe name) began manufacturing, marketing and selling turnout gear with DuPont's NOMEX® PFAS-containing flame resistant fabric in 1966. MSA (under the Globe name) continues to manufacture, market and sell turnout gear using PFAS-containing fabrics supplied by its partners, DuPont, Gore, Tencate, and PBI.[17]

110.  Defendant Lion began to manufacture, market and sell turnout gear in 1970.  Since its founding, and continuing through to the present, Lion makes, markets and sells turnout gear using PFAS-containing fabrics, including Teflon® F-PPE-treated thermal lining material supplied by Defendant Chemours (a spin-off from Defendant DuPont), DuPont's NOMEX® PFAS-containing flame/water/oil-resistant fabric, and moisture barrier fabrics supplied by Defendant Gore.[18]

---

[17] *See Globe History*, Globe MSA Safety Website, (last visited September 7, 2020), https://globe.msasafety.com/history; *Turnout Gear Materials*, Globe MSA Safety Website, (last visited September 7, 2020), https://globe.msasafety.com/materials.

[18] *See Our History*, Lion Website (last visited September 7, 2020), www.lionprotects.com/lion-history; *Firefighter Turnouts*, Lion Website (last visited September 7, 2020), www.lionprotects.com/lion-history.

- 33 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

### D.    Defendants Know Exposure to PFAS Causes Serious Health Impacts

111.    Defendants, including specifically 3M and DuPont, have long known about the serious and significant impacts to health caused by exposure to PFAS, having conducted study after study on the exposure and health effects of PFAS on animals, and in some cases, even on their own employees. The findings of these studies were discussed within the companies internally, yet were never made public or shared with any regulatory agencies.  Among the findings:

   a.  A 1950 3M study showed that PFAS could build up in the blood of mice and that PFAS could bind to proteins in human blood suggesting that PFAS would not only remain, but also persist and accumulate in the body of the exposed individuals with each additional exposure.[19]

   b.  In 1961, a DuPont toxicologist warned that PFAS chemicals enlarge rat and rabbit livers.[20]  A year later, these results were replicated in studies with dogs.[21]

   c.  In 1963, 3M's technical handbook classified PFAS as toxic and advised that "due care should be exercised in handling these materials."[22]

   d.  In 1970, a company that purchased 3M's firefighting foam had to abandon a test of the product because all the fish died.[23]

   e.  In the 1970s, DuPont discovered that there were high concentrations of PFOA in the blood samples of factory workers at DuPont's Washington Works site.[24]

   f.  By the end of the 1970s, studies performed by, at least 3M, indicated that PFAS materials were resistant to environmental degradation and would persist in the environment.[25]

---

[19] Timeline - *For 50 Years, Polluters Knew PFAS Chemicals Were Dangerous But Hid Risks From Public*, Environmental Working Group, (2019), https://static.ewg.org/reports/2019/pfa-timeline/3M-DuPont-Timeline_sm.pdf; *see also*, https://www.ewg.org/pfastimeline/.

[20] *Id.*

[21] Nathaniel Rich, *The Lawyer Who Became DuPont's Worst Nightmare*, New York Times (June 6, 2016),https://www.nytimes.com/2016/01/10/magazine/the-lawyer-who-became-duponts-worst-nightmare.html.

[22] *Id.* at fn. 19.

[23] *Id.*

[24] *Id.* at fn. 21.

[25] *PFCS: Global Contaminants: PFCs Last Forever*, Environmental Working Group, (last visited September 9, 2020), https://www.ewg.org/research/pfcs-global-contaminants/pfcs-last-forever.

- 34 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

g. In 1981, 3M, which still supplied PFOA to DuPont and other corporations, found that ingestion of PFOA caused birth defects in rats. 3M reported this information to DuPont. DuPont then tested the children of pregnant employees in their Teflon division and found that of seven births, two children had eye defects. Defendants reassigned the female employees, but did not inform the EPA or make this information public.[26]

h. In 1988, a company that purchased PFAS firefighting foam complained to 3M because the product was not biodegradable as 3M represented.[27] Subsequently, a 3M employee wrote an internal memo that "3M should stop perpetrating the myth that these fluorochemical surfactants are biodegradable, but the company continued to sell them."[28]

i. By at least the end of the 1980s, research performed by Defendants, including specifically, Defendants 3M and DuPont, manufacturing and/or using PFAS materials indicated that at least one such PFAS material, PFOA, caused testicular tumors in a chronic cancer study in rats, resulting in at least Defendant DuPont classifying such PFAS material internally as a confirmed animal carcinogen and possible human carcinogen.[29]

j. In the 1990s, Defendant DuPont knew that PFOA caused cancerous testicular, pancreatic and liver tumors in lab animals. One study also suggested that PFOA exposure could cause possible DNA damage.[30]   Another study of workers found a link between PFOA exposure and prostate cancer.[31]

k. In response to the alarming and detrimental health impact, DuPont began to develop an alternative to PFOA and in 1993, an internal memo announced that "for the first time, we have a viable candidate" that appeared to be less toxic and showed less bioaccumulation.[32]   DuPont decided against using this potentially safer alternative, however, because products manufactured with PFOA were worth $1 billion in annual profit.[33]

---

[26] *Id.* at fn. 21.

[27] *The Devil They Knew: PFAS Contamination and the Need for Corporate Accountability, Part II*, Transcript of Hearing Before the Subcommittee on Environment of the Committee on Oversight and Reform, House of Representatives (September 19, 2019), https://docs.house.gov/meetings/GO/GO28/20190910/109902/HHRG-116-GO28-Transcript-20190910.pdf.

[28] *Id.*

[29] *Id.* at fn. 19.

[30] *Id.* at fn. 21.

[31] *Id.*

[32] *Id.*

[33] *Id.*

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

l. On June 30, 2000, 3M and DuPont met to share 3M's "pertinent data on PFOA". 3M informed DuPont that the half-life of PFOA was much longer than animal studies showed.[34]

112. Additionally, approximately fifty years of studies by Defendants, including by 3M and DuPont, on human exposure to PFAS found unacceptable levels of toxicity and bio-accumulation, as well as a link to increased incidence of liver damage, various cancers, and birth defects in humans exposed to PFAS.[35] These studies also revealed that, once in the body, PFAS has a very long half-life and that it takes years before even one-half of the chemicals begin to be eliminated from the body—assuming, of course, the body experiences no additional PFAS chemical exposure.[36]

113. In the face of these findings, and despite passage of the Toxic Substances Control Act in 1976, which requires companies that manufacture, process or distribute chemicals to immediately report to the Environmental Protection Agency ("EPA") information that "reasonably supports the conclusion" that a chemical presents a substantial risk to health or the environment, Defendants did not inform the EPA, Plaintiffs, or the public about the health impacts resulting from exposure to PFAS.[37] Indeed, in at least some instances, Defendants' own attorneys advised the companies to conceal their damaging findings on PFAS, which they did for decades.[38]

114. In 2000, 3M announced that it would cease manufacturing a specific PFAS chemical, PFOS, as well as Class B foam, on the same day the EPA announced that PFOA and PFOS, two chemicals in the PFAS family, had a "strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."[39]

---

[34] Internal DuPont Memorandum, DuPont Haskell Laboratory Visit (June 30, 2000), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1721.pdf.

[35] Id. at fn. 19, https://static.ewg.org/reports/2019/pfa-timeline/3M-DuPont-Timeline_sm.pdf; Id. at fn. 27.

[36] Id.

[37] Id. at fn. 21.

[38] Id. at fn. 27.

[39] EPA and 3M Announce Phase Out of PFOS, Press Release, United States Environmental Protection Agency (May 16, 2000), https://archive.epa.gov/epapages/newsroom_archive/newsreleases/33aa946e6cb11f35852568e1005246b4.html.

- 36 -

115. However, 3M did not recall PFOS, its chemical feedstock, or any Class B foam that it had previously manufactured, sold, or distributed, or that was then stored at firehouses and being used by firefighters around the country. And, no other Defendant stopped manufacturing PFAS chemicals or products containing PFAS. Rather, Defendants continued to manufacture, develop, market, promote, distribute and sell PFAS chemicals and PFAS-containing products, including specifically Class B foam and PFAS-containing turnouts, and did so without any warning to firefighters or to the public concerning the fact that these foams and turnouts contained PFAS, or that they posed a serious health risk to human health. Defendants instead continued to claim their products were safe.

116. By the 2000s, Defendants' own research of its employees revealed multiple adverse health effects among workers who had been exposed to PFAS, including increased cancer incidence, hormone changes, lipid changes, and thyroid and liver impacts.[40]

117. In 2001, a class action lawsuit was filed in West Virginia against DuPont on behalf of people whose water had been contaminated by the nearby DuPont chemical plant where PFAS chemicals were manufactured.

118. Defendants continued to manufacture, market, promote, distribute, and sell PFAS and PFAS-containing products, including Class B foam and turnouts, and continued to publicly claim that these products were safe. Defendants affirmatively suppressed independent research on PFAS, and instead commissioned research and white papers to support their claims that PFAS and PFAS-containing products were safe to use, engaging consultants to further this strategy and ensure that they would continue to profit from these toxic chemicals and products.

119. As one consultant wrote in pitching its services to DuPont, it was critical that the PFAS industry develop an aggressive strategy to "[discourage] governmental agencies, the plaintiffs' bar and misguided environmental groups" and "[implement] a strategy to limit the effect of litigation and regulation on the revenue stream generated by PFOA." The strategy was further described by consultant as follows:

[40] *Id.* at fn. 19.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS. . . .The outcome of this process will result in the preparation of a multifaceted plan to take control of the ongoing risk assessment by the EPA, looming regulatory challenges, likely litigation, and almost certain medical monitoring hurdles. The primary focus of this endeavor is to strive to create the climate and conditions that will obviate, or at the very least, minimize ongoing litigation and contemplated regulation relating to PFOA. *This would include facilitating the publication of papers and articles dispelling the alleged nexus between PFOA and teratogenicity as well as other claimed harm*. We would also lay the foundation for creating Daubert precedent to discourage additional lawsuits.[41]

120. Class B foam manufacturers and distributors adopted a similarly aggressive industry campaign to evade government oversight or public attention of the risks posed by their products. At a March 2001 meeting of the National Fire Protection Association's Technical Meeting on Foam, which included Defendant Class B foam manufacturers Tyco, Chemguard and National Foam, a 3M representative informed attendees that 3M had discontinued its Class B foam business, citing concerns about the "proven pervasiveness, persistence and toxicity" of PFOS.[42] Attendees also were informed of evidence that telomer-based fluorosurfactants (used by every Class B foam manufacture except 3M) degrade to PFOA and, worse, exhibit an even greater degree of pervasiveness and toxicity than PFOA.

121. On or about the same time, certain Defendants, including at least Tyco, DuPont, Dynax, Kidde, and Buckeye, founded and/or became members of the Fire Fighting Foam Coalition ("FFFC") – a non-profit organization of manufacturers, distributors and suppliers of Class B foam (specifically AFFF). The FFFC's self-described role was to be "the environmental voice for users and manufacturers of AFFF"[43] – one designed to ignore the health impacts of exposure to PFAS-containing Class B foams such as AFFF:

Not too long ago, 3M had environmental concerns about a chemical in their product and decided to withdraw from the AFFF market. Even though no other manufacturers used the questionable chemical, the withdrawal of 3M from AFFF production raised a red flag. As a direct result, a lot of half-truths and misinformation published by

[41] Letter from P. Terrence Gaffney, Esq of The Weinberg Group to Jane Brooks, Vice President, Special Initiatives, DuPont de Nemours & Company, regarding PFOA (April 29, 2003).
[42] NFPA-11 Technical Committee Meeting Notes (National Fire Protection Association for Standards on Low-, Medium- and High-Expansion Foam) (March 14-15, 2001), https://assets.documentcloud.org/documents/4178280/NFPA-Schedule.pdf.
[43] Fire Fighting Foam Council Website (last visited September 7, 2020), https://www.fffc.org/.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

some well-meaning, but misinformed, groups began to surface. One organization went so far as to label our products as "hazardous waste" and as posing an "occupational health or environmental hazard." At the same time, the Federal government was focusing its attention on the industry and needed to identify an industry representative that could provide fact-based information and serve as a focal point for dialogue. We decided, therefore, to form the FFFC in order to educate, inform and help persuade regulatory and legislative decision-makers that firefighting foams are a value-added component to any firefighting capability.[44]

122.    Defendants also pivoted with a new industry strategy. Defendants continued to produce Class B foams containing PFAS and continued to publicly represent that PFAS and/or products containing PFAS were safe, while developing newer, "short-chain" PFAS alternatives.

123.    In 2005, the EPA fined DuPont $16.5 million for failing to submit decades of toxicity studies of PFOA (one PFAS chemical manufactured by the company).[45] In the face of and undeterred by the EPA's action, Defendant turnout manufacturers, such as MSA (Globe) and LION, partnered with DuPont and with Defendant Gore to develop, manufacture, market, distribute and turnouts made with DuPont's and/or Gore's PFAS-based textile coatings (e.g., Nomex® and Gore® Protective Fabrics).[46]

124.    In 2006, the EPA "invited" eight PFOA manufacturers, including Defendants DuPont, 3M, Arkema, Daikin and Solvay, to join in a "Global Stewardship Program" and phase out production of PFOA by 2015.[47]

125.    By this time, Defendants had begun to aggressively market, distribute and short-chain

---

[44] *Id.* at https://web.archive.org/web/20020811142253/http:/www.fffc.org/about.html (captured August 11, 2002).

[45] Michael Janofsky, *DuPont to Pay $16.5 Million for Unreported Risks*, New York Times (December 5, 2005), https://www.nytimes.com/2005/12/15/politics/dupont-to-pay-165-million-for-unreported-risks.html.

[46] *DuPont and LION Collaborate to Better Protect Firefighters and First Responders*, Press Release, DuPont and LION (January 30, 2013), https://www.prweb.com/releases/dupont_protection_tech/lion_turnout_gear/prweb10362363.htm; *Our Partners*, Globe Website (last visited September 7, 2020), https://globe.msasafety.com/our-partners; and *Firefighter & Emergency Response Protection,* DuPont Website (last visited September 7, 2020), https://www.dupont.com/personal-protection/firefighter-protection.html.

[47] *PFOA Stewardship Program*, United States Environmental Protection Agency (last visited September 7, 2020), https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/risk-management-and-polyfluoroalkyl-substances-pfas#tab-3.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

PFAS, such as Gen X, claiming that these alternative PFAS chemicals did not pose significant health risks to humans or the environment. But, these claims, too, were false. Defendants knew that certain of these short-chain PFAS chemicals had been found in human blood, and that at least one of them produces the same types of cancerous tumors (testicular, liver, and pancreatic) in rats as had been found in long-chain PFAS studies.[48]

126.    In 2011, a C8 Science Panel convened as part of a settlement in the West Virginia DuPont water contamination case described in paragraph 117, above, began releasing its findings. The Panel had analyzed the blood serum of nearly 70,000 residents living in the water contamination area for two long-chain PFAS (PFOA and PFOS), and found significant negative human health effects (including, kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, high cholesterol and preeclampsia) associated with exposure to these PFAS chemicals in the area groundwater.

127.    In 2013, DuPont entered an agreement with the EPA and ceased production and use of PFOA – just one of thousands of PFAS chemicals the company makes, promotes and sells. Defendants, however, continued manufacturing short-chain PFAS materials, chemical feedstock, and products—all the while peddling them as safer, and as more easily bio-degraded than long-chain PFAS, despite evidence to the contrary.[49]

128.    In 2015, DuPont spun-off its PFAS chemicals business, as well two-thirds of its environmental liabilities and 90% of its active litigation, to Defendant Chemours. As part of the transaction, DuPont required Chemours to indemnify the "new" DuPont for all assigned environmental liabilities should a regulatory agency or plaintiff seek to hold the "new" DuPont accountable. As Chemours President Paul Kirsch testified before Congress: "DuPont designed the separation of Chemours to create a company where it could dump its liabilities to protect itself from environmental cleanup and related responsibilities."[50]

129.    In June 2018, the Agency for Toxic Substances and Disease Registry (ASTDR), a division of the Centers for Disease Control and Prevention at the US Department of Health and

---

[48] Sharon Lerner, *New Teflon Toxin Causes Cancer in Lab Animals*, The Intercept (March 3, 2016), https://theintercept.com/2016/03/03/new-teflon-toxin-causes-cancer-in-lab-animals/.
[49] *Id.* at fn. 13, http://blogs.edf.org/health/2019/02/20/potential-biopersistence-short-chain-pfas/.
[50] *Id.* at fn. 27.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Human Services released an 852-page draft toxicology report analyzing scientific data about the most common PFAS chemical variants, finding that PFAS "are potentially more hazardous than previously known, are particularly concerning because of these compounds' persistence in the environment and widespread prevalence—PFAS are extremely slow to biodegrade."[51]

130.   In September 2019, DuPont chief operations and engineering officer Daryl Roberts testified before Congress that the "new DuPont" (to be distinguished from the "old DuPont" which manufactured and sold PFAS for decades before being spun-off to Chemours) no longer uses or manufactures PFAS and is no longer responsible for obligations and harms resulting from over 65 years of producing PFAS.[52]   Roberts further testified that he knew nothing about "old DuPont's" efforts to suppress research on PFAS' toxicity as testified to by one of DuPont's former scientists only a few days earlier.[53]   Finally, he stated that any liabilities from "old DuPont's" PFAS operations were now Chemours' problem because DuPont is essentially a completely new company with no past – only a bright future of doing good in the world.[54]

**E.     Defendants Failed to Warn Plaintiffs of the Dangers of Exposure to PFAS and Falsely Represented That Their PFAS Products Were Safe**

131.   As alleged above, Defendants knew that PFAS are persistent, toxic, and bio-accumulating with a very long half-life. They knew that exposure to PFAS can cause serious and life-threatening diseases, including cancer.

132.   Yet, Defendants **did not warn** Plaintiffs that PFAS and Defendants' PFAS-containing products, including Class B foams and turnouts used by the Firefighter Plaintiffs, contained PFAS, or that exposure to PFAS in the normal and intended use of such products, causes serious bodily harm and illnesses, including cancer.

133.   Instead, Defendants have falsely represented—and continue to falsely represent— that

---

[51] *A Toxic Threat: Government Must Act Now on PFAS Contamination at Military Bases*, Center for Science and Democracy (September 2018), https://www.ucsusa.org/sites/default/files/attach/2018/09/a-toxic-threat-pfs-military-fact-sheet-ucs-2018.pdf.
[52] *Id.* at fn. 27.
[53] *Id.*
[54] *Id.*

- 41 -
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

PFAS and PFAS-containing products, including Class B foams and turnouts, are safe and not harmful to humans or the environment.

**(1)    Defendants Provide No Safety Warnings on Product Labels**

134.    Plaintiffs allege that the packaging on the PFAS-containing Class B foam containers used for mixing Class B foam with water, pumping the mixture into engines, and for spraying and laying foam blankets for fire suppression or fire suppression training, contained no warning that the Class B foam contained PFAS, or informing persons handling or using the foam as it was intended to be handled or used that such use can result in exposure to PFAS and serious bodily harm.

135.    Below are pictures of some of the Class B foam containers manufactured, marketed, distributed, or sold by Defendants in California, and used by the Firefighter Plaintiffs in training or in fire suppression during their firefighting careers. The labels on the containers warn only of possible skin or eye irritation, and suggest rinsing areas of contact with water. They contain *no information* about the Class B foam containing PFAS or PFAS-containing materials, and provide *no warning whatsoever* of the human health risks and serious health conditions associated with PFAS exposure resulting from the normal and intended use of Class B foam in fire suppression or fire suppression training.



COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

136.    Plaintiffs further allege that turnouts containing PFAS or PFAS materials sold by Defendants into California, and used by the Firefighter Plaintiffs in training or in fire suppression during their firefighting careers, also contained no warning that the turnouts contain PFAS or PFAS materials. Nor did these labels inform persons handling, wearing, or using the turnouts as there were intended to be handled, worn or used can result in exposure to PFAS and serious bodily harm.

137.    Below are pictures of warning labels for turnouts manufactured, marked, sold and distributed by Defendants MSA (Globe) and LION. As depicted below, the labels make no mention of PFAS, do not advise that the turnouts contain PFAS or PFAS materials, and contain no warning that handling, wearing, or using the turnouts as they were intended to be handled, worn or used can result in exposure to PFAS and serious bodily harm. Further, while the labels provide washing instructions, the instructions do not advise that turnouts should be washed in a commercial extractor to prevent cross-contamination and PFAS-exposure to family members who handle or wash the turnouts with other garments in home washing machines.

- 43 -
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF



COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Garment Safety Label



Garment Cleaning Label                                        Garment Information Label



Garment Liner Attachment Safety Label

Drag Rescue Device (DRD) Label

**Aspiration Hazard**
Not an aspiration hazard.

#### (2)   Defendants' MSDS Sheets Do Not Warn About PFAS or PFAS Exposure

138.   A Material Safety Data Sheet (or "MSDS") is a document that provides health and safety information about products, substances or chemicals that are classified as hazardous substances or dangerous goods. Access to chemical information like safety data sheets is especially important for the Firefighter Plaintiffs, to provide a safe and effective response to Hazmat events.

139.   The MSDS provided with Defendants' Class B foams did not – and to this day do not – state that these foams contain PFAS or PFAS-containing materials; that PFAS is persistent, toxic and bio-accumulating; or that PFAS exposure causes serious bodily harm.  To the contrary, the MSDS falsely stated that the Class B foams and/or their contents were *not* known carcinogens and did not cause birth defects.

140.   Even now, the MSDS do not reflect the known serious health risks and hazards

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

associated with exposure to PFAS in these Class B foams. For example, a MSDS issued on August 21, 2019 by Defendant National Foam for AFFF stated the product *was not carcinogenic or toxic.*[55]

### (3) Defendants' Misrepresentations About PFAS Continue to this Day

141. Despite their decades of knowledge about PFAS and its dangers, Defendants continue to make false claims, continue to misrepresent the safety of PFAS, and continue to minimize and fail to warn about the hazards of exposure to PFAS, or Class B foams and turnouts made with or containing PFAS.

142. Defendants' misinformation campaign is long-standing, and continues to this day. Some pertinent examples include:

a. 2017 – Defendant LION's President, Stephen Schwartz, wrote a letter to the editor of the Columbus Dispatch, expressing outrage at the assertion in a government filing that firefighters may have been exposed to PFAS through turnout gear. Schwartz called this assertion false, stating that LION's turn-out gear is not treated or made with PFOS or PFOA:. "PFOAs and PFOSs have never been components of LION's turn-out gear, either as a coating or as a textile." He acknowledged that turn-out gear is treated with PTFE to provide a durable water repellant, and that the textile industry in the past had used PFOA as a processing aid to manufacture PTFE moisture barrier films and repellants. "It is possible that trace amounts may have been present as a residue when the films and finishes were incorporated into LION's turn-out gear. *However, based on all available scientific data, such nominal trace amounts, if they existed at all, would not have posed any health risk to firefighters. There is absolutely no connection at all between PFOS and firefighter turnout gear."* (Emphasis added).[56]

b. 2018 – The National Fire Protection Association (which maintains committees on foams and turnouts that are comprised, in part, of certain Defendants) issued a publication listing 11 ways to minimize risk of occupational cancer – the

---

[55] National Foam Safety Data Sheet for Centurion (TMC6) 6% Aqueous Film Forming Foam Concentrate (AFFF) (August 21, 2019), https://nationalfoam.com/wp-content/uploads/sites/4/NMS340-Centurion-6-AFFF.pdf.

[56] Letter from LION president Stephen A. Schwartz to Ala D. Miller, Editor, The Columbus Dispatch (October 30, 2017), http://files.constantcontact.com/bf8abd7a001/01f5d727-d72e-42dc-971b-caa9c2855800.pdf.

- 46 -
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

suggestions centered on wearing turnouts for protection resulting from combustion or spills, and cleaning turnouts after exposure to chemicals. There was not a single mention of avoiding contact with foam and/or the risks of wearing turnouts containing PFAS or PFAS-containing materials.[57]

c. 2019 – Defendant 3M Vice President, Denise Rutherford, testified before Congress that she **absolutely agreed with the statement that "the weight of current scientific evidence does not show that PFOS or PFOA cause adverse health effects in humans at current rates of exposure."** (emphasis added)[58]

d. 2019 - The Fire Fighting Foam Council (of which many Defendants have been members since its inception in 2001) wrote in their newsletter that: "Short-chain (C6) fluorosurfactants do not contain or breakdown in the environment to PFOS or PFOA and are currently considered lower in toxicity and have significantly reduced bio-accumulative potential than long-chain PFAS."[59]

e. 2020 - FluorCouncil – the lobbying arm of the PFAS industry – maintains that PFAS fluorotelomers that are in Class B foam and turnouts do not cause cancer, disrupt endocrine activity, negatively affect human development or reproductive systems, do not build up in the human body, and do not become concentrated in the bodies of living organisms.[60]

f. 2020 – The Fire Fighting Foam Council website states: "The short-chain (C6) fluorosurfactants that have been the predominant fluorochemicals used in fluorotelomer-based AFFF for the last 25 years are low in toxicity and not considered to be bio-accumulative based on current regulatory criteria."[61]

---

[57] *11 Best Practices for Preventing Firefighter Cancer Outlined in New Report Put Out by VCOS and NVFC*, National Fire Protection Association Xchange (August 16, 2018), https://community.nfpa.org/community/nfpa-today/blog/2018/08/16/11-best-practices-for-preventing-firefighter-cancer-outlined-in-new-report-put-out-by-vcos-and-nvfc.

[58] Gabe Schneider, *3M Grilled over PFAS Chemicals at Congressional Hearing*, MinnPost (September 11, 2019), https://www.minnpost.com/national/2019/09/3m-grilled-over-pfas-chemicals-at-congressional-hearing/.

[59] *AFFF Update Newsletter*, Fire Fighting Foam Council (April 2019), https://tinyurl.com/y57c5jwx.

[60] *An Important Update About FluoroCouncil*, FluoroCouncil, Global Industry Council for Fluoro Technology (last visited September 7, 2020), https://fluorocouncil.com/important-update-about-fluorocouncil/.

[61] *Fact Sheet on AFFF Fire Fighting Agents*, Fire Fighting Foam Council (2017), https://tinyurl.com/yyxscyas.

- 47 -

g.  2020 – The Fire Fighting Foam Council's Best Practice Guidance for Use of Class B Foam focuses entirely on eliminating and containing foam to minimize impact on the environment.  It makes no mention of how to minimize the impact on firefighters who routinely handle, prepare, spray, or use Class B foam during training or in firefighting.

143.  As frequent sponsors and advertisers in fire service publications, Defendants have been so influential in the industry that fire service leadership have echoed these narratives.

144.  For example, in 2017, the International Association of Fire Fighters issued a statement that both mischaracterizes and purports to state that the risks associated with exposure to PFAS and PFAS chemicals and materials in Class B foams and turnouts are minimal to non-existent. The statement even encourages firefighters to continue to use legacy Class B foams and wear turnouts, creating a false sense that these PFAS-containing foams and turnouts are safe.  The statement reads, in relevant part:

> Importantly, PFOA use has been almost completely phased out in the US....Fire fighters may have additional PFOA exposure sources such as older Class B firefighting foams. If PFOA is a combustion product of PFOA-containing consumer products made prior to phasing out use of this chemical, fire fighters will be exposed in fire suppression activities. However, the data are too limited at present to determine this. PFOA is unlikely to be a component in recently US manufactured turnout gear. However, if PFOA is a combustion product, it may be present as a contaminant on turnout gear. PFOA may also be present as a manufactured component of legacy turnout gear....The exposure contribution from any such PFOA content is likely to be minimal since volatilization from the manufactured product would be required....**At this time, IAFF does not recommend that legacy turnout gear be replaced outside of its lifecycle. Fire fighters wishing to minimize PFOA exposure should continue to wear their PPE...and regularly decontaminate their turnout gear.**  IAFF will continue to monitor developments and update this fact sheet should new information become available.[62]

145.  Because of these and other false claims and misrepresentations on the part of Defendants, the Firefighter Plaintiffs did not know and, in the exercise of reasonable diligence, could

---

[62] *Statement on PFOA and Turnout Gear*, International Association of Firefighters, (May 2017), https://tinyurl.com/y29mfh69.

- 48 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

not have known that the Class B foams and turnouts they used contained PFAS or PFAS-containing materials, and caused the Firefighter Plaintiffs to be exposed to PFAS and/or PFAS-containing materials, causing them to suffer cancers and other serious illnesses as a result of such exposure.

146. The Firefighter Plaintiffs only learned for the first time that they had significantly elevated levels of PFAS in their blood in July 2020, when they received test results of their blood serum.

**F.    New Research Indicates That Firefighters are at Significant Risk of Harm From Exposure to PFAS in Class B Foams and Turnouts—But Defendants Continue to Discount or Deny These Risks**

147. While historical research (and follow-on litigation) has centered on environmental impacts and environmental exposures associated with PFAS and PFAS-containing products, recent studies have focused specifically on the serious health impacts to firefighters stemming from their occupational exposure to Class B foams and turnouts containing PFAS.

148. In October 2019, for example, an expert panel of the International Pollutants Elimination Network (IPEN), an international non-profit organization comprised of over 600 public interest non-governmental organizations dedicated to improving global chemical waste policies, published a scientific paper that, in the words of its authors, "presents unequivocal evidence from recent studies that firefighters" using Class B foams (primarily AFFF) "have unexpectedly elevated blood levels" of PFAS, including, specifically, PFHxS and PFOS, with PFHxS (a short-chain, C6 PFAS) being "potentially of greater concern than PFOS given its much longer elimination half-life in humans." [63]  The paper explains that "[f]irefighters can be significantly exposed to PFHxS and other PFAS from firefighting foam via various occupational mechanisms including direct exposure during use as well as exposure from contaminated personal protective equipment (PPE), handling of contaminated equipment, managing PFAS foam wastes, occupation of contaminated fire stations and consumption of contaminated local water and produce. Cross-contamination and legacy PFAS

---

[63] *Perfluorohexane Sulfonate (PFHxS) – Socio-Economic Impact, Exposure and the Precautionary Principle Report*, IPEN Expert Panel (October 2019), https://ipen.org/sites/default/files/documents/pfhxs_socio-economic_impact_final_oct.2019.pdf.

- 49 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

residues from inadequately decontaminated appliances after transitioning to fluorine-free foam can remain a long-term problem."[64] The panel concluded that "[o]ngoing exposure to PFHxS, PFOS and other PFAS amongst firefighters remains a major occupational health issue," noting that "[b]io-accumulation and very slow bio-elimination may be very significant influencing factors in PFHxS exposure" in firefighters[65]. "Of greater concern," the panel observed, "is that firefighter blood levels for PFOS and PFHxS are many times higher than the median values for the general…population."[66]

149.    In June 2020, scientists at the University of Notre Dame published a ground-breaking study on PFAS in turnout gear, and the exposure risks posed to firefighters that wear, wore, or handle such gear ("Notre Dame Turnout Study"). The Notre Dame Turnout Study analyzed over 30 sets of used and unused (still in their original packaging) turnout gear made by six U.S. manufacturers, including Defendants MSA (Globe) and LION, over several production years, as listed below:[67]

| PPE gear manufacturers sampled: | # samples |
|---|---|
| Globe Manufacturing (Pittsfield MA), | 11 |
| Lion Group (Dayton OH), | 12 |
| Honeywell First Responder (Dayton, OH), | 2 |
| Lakeland Fire (Decatur, AL) | 2 |
| Quest Fire Apparel (Saratoga Springs, NY) | 1 |
| Quaker Safety (Quakertown, PA) | 2 |

The type and number of turnout gear samples used in this study.

150.    The Notre Dame Turnout Study noted that these manufacturers' turnout gear (or personal protective equipment-PPE, as it is described in the study) are manufactured "from textiles that are made from fluoropolymers (one form of PFAS) or extensively treated by PFAS in the form

---

[64] *Id.* at p. 25.

[65] *Id.*

[66] *Id.*

[67] *Id.* at fn. 8.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

of side-chain fluoropolymers."[68] According to the researchers, "[t]hese PFAS include fluoropolymer materials such as PTFE used as a moisture barrier in the inner layers of turnout gear."[69] The study found significant levels of PFAS chemicals – including PFOA, PFOS, PFBA, PFPeA, PFHxA, PFHpA, PFNA, PFDA, PFUnA, PFDoA, PFTrDA, PFToDA, PFBS, PFOSA, N-EtFOSA, MeFOSAA, N-MeFOSE, N-EtFOSE and 6:20FTS – in both new and used turnout gear, and across layers, portions, and materials in the turnout gear, including in material layers that are not intentionally treated with PFAS by the manufacturer, thereby providing "the first evidence that suggests PFAS appear to migrate from the highly fluorinated layers and collect in the untreated layer of clothing worn against the skin."[70] These findings are summarized in the table below:

**Environmental Science & Technology Letters**    pubs.acs.org/journal/estlcu    Letter

Table 2. Quantities of Target PFAS (in ppb) Found in US Turnout Gear by LC–MS/MS Analysis

| values in ppb | jacket 2008 unused | | | pants 2014 used | | | jacket 2008 used | jacket 2017 unused |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | thermal liner | moisture barrier | outer shell | thermal liner | moisture barrier | outer shell | moisture barrier | moisture barrier |
| PFBA | <MDL | 12.8 | 10.6 | 13.9 | 61.5 | 21.5 | 20.5 | 99.1 |
| PFPeA | <MDL | 12.6 | 17.8 | 22.8 | 104 | 164 | 18.1 | 2.49 |
| PFHxA | <MDL | 30.5 | 36.9 | 199 | 28.6 | 10.9 | 35.8 | 36.9 |
| PFHpA | <MDL | 12.4 | 25.4 | 105 | 5.82 | 2.23 | 14.3 | 25.4 |
| PFOA | 78 | 46 | 182 | 850 | 71 | 97 | 37 | <MDL |
| PFNA | 2.63 | <MDL | 8.2 | 25.3 | 1.95 | <MDL | 2.76 | <MDL |
| PFDA | 2.98 | 6.51 | 5.51 | 133 | <MDL | <MDL | 23.7 | <MDL |
| PFUnA | <MDL | <MDL | <MDL | 7.96 | <MDL | <MDL | 2.51 | <MDL |
| PFDoA | <MDL | 5.01 | <MDL | 68.6 | <MDL | <MDL | 25.9 | <MDL |
| PFBS | 283 | 140 | 142 | 53400 | 47900 | 1050 | 230 | 90400 |
| PFOS | <MDL | <MDL | <MDL | 7 | <MDL | <MDL | 2 | <MDL |
| 6:2 FTS | <MDL | <MDL | <MDL | 25.9 | 12.9 | <MDL | <MDL | <MDL |
| 8:2 FTS | <MDL | <MDL | <MDL | 11.1 | <MDL | <MDL | <MDL | <MDL |

151.    "Startlingly," researchers reported, "garment to hand transfer of total fluorine in the ppm range was also observed when researchers simply manipulated the textiles in [the] laboratory."[71] The accumulation of PFAS on researchers' hands strongly suggests that transference of ppm levels of PFAS can occur merely by handling the turnouts. This finding poses a health exposure concern not only for firefighters that rely on turnouts to protect them from heat, fire, water and chemical

---

[68] *Id.* at p. A.

[69] *Id.*

[70] *Id.* at p. C.

[71] *Id.*

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

hazards in the field, but to family members who may be exposed to the PFAS in turnouts as the result of home washing or storage.

152.     Defendants have been quick to mischaracterize, dismiss or downplay the significance of the Notre Dame Turnout Study. Defendant MSA (Globe), when contacted about the study and asked whether Globe planned to study this issue and find an alternative to PFAS for turnouts, merely responded thusly: "[P]rotecting (firefighters) is Globe's business; every piece of our turnout gear meets or exceeds applicable industry standards."[72]

153.     Defendant Lion's responses have been similar, and have also dismissed or minimized the significance of the Notre Dame Turnout Study's findings. Lion issued a Customer Safety Alert for PFOA and Turnout Gear stating: "Your LION turnout gear continues to be safe and ready for action especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job."[73]

154.     The Customer Safety Alert goes on to stress that Lion does not use PFOA or PFOS (two long-chain PFAS chemicals) in its turnouts.[74]  It does not, however, address that the maker's turnouts in fact contain other PFAS chemicals, nor warn firefighters or the public about health harms associated with exposure to these toxic, bio-accumulating chemicals.

**HERE'S ALL YOU NEED TO KNOW ABOUT PFOA AND YOUR TURNOUT GEAR.**

**What is PFOA and why are we talking about it?**

Perfluorooctanic Acid (PFOA) is a chemical that until recently was used in the process to make many different industrial chemicals and products. The manufacture and use of PFOA was mostly phased out by major chemical companies by 2010. By 2015, its manufacture was eliminated in the United States.

In the firefighting protective clothing industry, PFOA was used as a processing agent in the manufacture of resins used to make PFTE films – the primary component of the moisture barrier used in turnout gear. While most residual PFOA was eliminated from the manufacturing process of PTFE, some tiny trace amounts remained.

LION does not use PFOA or PFOS in our turnout gear or any of our protective products.

PFOS has never been a component of turnout gear. PFOS health and environmental concerns are largely related to AFFF foams and are not connected to turnout gear.

---

[72] Blair Miller, *Local Firefighters Concerned About Potentially Dangerous Chemicals on Gear*, Boston 25 News (February 26, 2019), https://www.boston25news.com/news/local-firefighters-facing-concerns-over-potentially-dangerous-chemicals-on-gear/92523612/..

[73] LION Customer Safety Alert – PFOA and Turnout Gear (April 24, 2019), https://cdn2.hubspot.net/hubfs/3475623/LION_PFOA_factsheet_042419.pdf.

[74] *Id.*

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

155. Defendant Lion's paid consultant, Dr. Paul Chrostowski, also has taken aim at the Notre Dame Turnout Study and its findings. Refuting a *Fire Rescue* magazine article about the study,[75] Chrostowski repeated Lion's website statement that "PFOA was never part of the gear itself and frequent independent testing has found only trace amounts of it in any of the gear – not nearly enough to cause concern, and in amounts similar to consumer products."[76] Chrostowski went on to say "[t]he fact is that one may find trace amounts of 'short-chain' PFAS such as PFBS and PFHxA in firefighting textiles, but the scientific research shows that these materials are far less toxic than even PFOA and at the tiny trace levels the risk are extremely low based on numerous credible published scientific research papers."[77] Finally, Chrostowski falsely stated that the link between PFAS exposure and cancer is "extremely weak."[78]

156. Defendants, including at least DuPont, Gore, Lion and MSA (Globe), have been regular sponsors of the International Association of Fire Fighters ("IAFF") Cancer Summit. At this event, as well as in firefighter cancer-related publications, programs and events, Defendants have repeatedly pushed the narrative that the high rate of cancer among firefighters is attributable either to *other chemicals* encountered in the line of duty, or firefighters' failure to wash their turnouts after every call. Not once have Defendants admitted that the PFAS materials in their products has been found to be carcinogenic, and that the very equipment that should be protecting firefighters are causing the most harm.

---

[75] https://firerescuemagazine.firefighternation.com/2020/05/28/what-if-i-told-you-that-your-bunker-gear-was-causing-cancer/#gref

[76] Paul Chrostowski, Ph.D., QEP, *Research and Independent Testing Shows Firefighters' Turnout Gear Remains Safe Despite Claims*, Fire Rescue (June 3, 2020). https://firerescuemagazine.firefighternation.com/2020/06/03/research-and-independent-testing-shows-firefighters-turnout-gear-remains-safe-despite-claims/#gref.

[77] *Id.*

[78] *Id.*

- 53 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF



157.   The Firefighter Plaintiffs deserve more. They are the first to respond to emergencies faced by their community, and never hesitate to help. Whether delivering a baby, responding to a fire, medical emergency, accident, mass shooting, terrorist attack, natural disaster, or teaching kids about fire safety, firefighters always put the community first. When a child is drowning in a pool or a family is caught in a burning house, they do not stop to calculate whether they will benefit by doing the right thing. They are true public servants. They step in and do what is needed when it is needed the most. Their health, safety and well-being must be of the highest priority.

**G.   The Firefighter Plaintiffs Have Significant Levels of PFAS in their Blood**

158.   After years of Defendants suppressing research showing PFAS to be toxic and associated with cancer and other serious illnesses, misrepresenting the safety of PFAS and PFAS-containing Class B foam and turnouts, and attributing the cause of firefighters' cancers and other serious illnesses to factors other than Class B foams and turnouts (or the PFAS chemicals and materials in these foams and turnouts), the Firefighter Plaintiffs could not know and, in fact, did not know that significant levels of PFAS had bio-accumulated in their blood.

159.   In July 2020, prior to filing this complaint, the Firefighter Plaintiffs submitted blood serum samples to public health professionals at the University of California, San Francisco (UCSF) for PFAS level testing and analysis. The results are startling.

160.   The testing shows that all of the Firefighter Plaintiffs have significant levels of PFAS in their blood for several PFAS chemicals, including PFOA, PFNA, PFDA, PFUnDA, PFOS,

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

PFDOA, PFOS, PFBA, and PFBuS. The geometric mean[79] for the Firefighter Plaintiffs' PFAS blood levels across each of these PFAS chemicals is substantially higher, for each of the above-described PFAS chemicals, than PFAS levels found in the general public as reported by the National Health and Nutrition Examination Survey ("NHANES") of the Center for Disease Control for the most recent NHANES reporting period.

161. Importantly, the Firefighter Plaintiffs' blood samples showed especially significant levels of PFOA and PFOS – two PFAS chemicals contained in Class B foams and turnouts that are known carcinogens and have been found to cause cancer and other serious health illnesses in humans.

162. The Firefighter Plaintiffs only learned for the first time that they had significantly elevated levels of PFAS in their blood in July 2020, when they received testing results of their blood serum.

163. Based on all of the foregoing, the Firefighter Plaintiffs, and certain of their spouses, the Spouse Plaintiffs, bring this action for damages and for other appropriate relief sufficient to compensate them for the significant harm Defendants' PFAS chemicals and PFAS-containing products have caused.

## EQUITABLE TOLLING OF APPLICABLE STATUE OF LIMITATIONS

164. Plaintiffs incorporate by reference all prior paragraphs of this complaint as though fully set forth herein.

**A.    Fraudulent Concealment**

165. Defendants have known or should have known about the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS and PFAS-containing materials since at least the 1960s and as late as the early 1990s when study after study showed not only unacceptable levels of toxicity and bioaccumulation in human blood, but links to increased incidence of liver damage, various cancers and birth defects.

166. Through no fault or lack of diligence, Plaintiffs were deceived regarding the safety of

---

[79] The geometric mean is a mean or average, which indicates the central tendency or typical value of a set of numbers by using the product of their values (as opposed to the arithmetic mean which uses their sum).

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Class B foam and turnouts and could not reasonably discover the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in Class B foam and turnouts, nor Defendants' deception with respect to the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in Class B foam and turnouts.

167. Plaintiffs did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were concealing the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in Class B foam and turnouts. As alleged herein, the existence of the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in Class B foam and turnouts was material to Plaintiffs at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiffs could not have discovered through the exercise of reasonable diligence the existence of the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in Class B foam and turnouts, nor that Defendants were concealing the fact of the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in Class B foam and turnouts.

168. Defendants did not fully disclose the seriousness of the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in Class B foam and turnouts, but instead ignored and/or concealed the defect from Plaintiffs and the public, and refused to provide safe alternatives to PFAS or PFAS-containing materials in Class B foam and turnouts.

169. At all times, Defendants are and were under a continuous duty to disclose to Plaintiffs the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in Class B foam and turnouts.

170. Defendants knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiffs reasonably relied on Defendants' knowing, active, and affirmative concealment.

171. For these reasons, any and all applicable statutes of limitations have been tolled as a consequence Defendants' ongoing knowledge, active concealment, and denial of the facts alleged

- 56 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

herein.

**B.     Estoppel**

172.     Defendants were and are under a continuous duty to disclose to Plaintiffs the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in Class B foam and turnouts.

173.     Instead, Defendants actively concealed the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS and PFAS-containing materials in Class B foam and turnouts; and knowingly made misrepresentations about the quality, reliability, characteristics, safety and performance of Class B foam and turnouts.

174.     Plaintiffs reasonably relied upon Defendants' knowing and affirmative misrepresentations, and/or active concealment, of these facts.

175.     Based on the foregoing, Defendants are estopped from relying on any and all applicable statutes of limitations in defense of this action.

**C.     Discovery Rule**

176.     The causes of action alleged herein did not accrue until Plaintiffs discovered that the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in Class B foam and turnouts.

177.     Plaintiffs, however, had no realistic ability to discern or suspect that the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in Class B foam and turnouts were a substantial cause of their injuries until—at the earliest— the Firefighter Plaintiffs received their test results revealing that they had significantly elevated levels of PFAS in July 2020.

178.     Even then, Plaintiffs would have had no reason to discover their causes of action, because of Defendants' active and ongoing concealment of the true nature of the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in Class B foam and turnouts, and their prior knowledge of it.

179.     Accordingly, Defendants are precluded by the Discovery Rule and/or doctrine of fraudulent concealment, and/or the doctrine of estoppel from relying upon any and all applicable

- 57 -
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

statutes of limitations.

## FIRST CAUSE OF ACTION

## STRICT LIABILITY - DESIGN DEFECT

180. This cause of action is asserted against all Defendants on behalf of all of the Firefighter Plaintiffs.

181. The Firefighter Plaintiffs incorporate by reference all prior paragraphs of this complaint, as though fully set forth herein.

182. Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired, have engaged in the business of manufacturing, distributing, supplying, testing, labeling, promoting, or advertising of Class B foam and/or turnouts and through that conduct have knowingly placed PFAS-containing products into the stream of commerce with full knowledge that they were sold to fire departments or to companies that sold Class B foam and/or turnouts to fire departments for use by firefighters such as the Firefighter Plaintiffs, who are exposed to PFAS through ordinary and foreseeable uses for the purpose of firefighting activities and training.

183. Defendants intended that the Class B foam and/or turnouts they were manufacturing, selling, distributing, supplying, promoting, and or selling would be used by firefighters, including the Firefighter Plaintiffs, without any substantial change in the condition of the products from when it was initially manufactured, sold, distributed, and marketed by Defendants. Class B foam and/or turnouts were not safe for use by firefighters even when used as directed by the manufacturer and for its intended purpose for firefighting activities which include training, extinguishment, ventilation, search-and-rescue, salvage, containment, and overhaul.

184. Further, knowing of the dangerous and hazardous properties of Class B foam and/or turnouts, Defendants could have manufactured, marketed, distributed, and sold alternative designs or formulations of Class B foam and/or turnouts that did not contain PFAS.

185. These alternative designs and/or formulations were already available, practical, similar in cost, and technologically feasible.

186. The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to the Firefighter Plaintiffs that was caused by the Defendants' manufacture,

- 58 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

marketing, and sale of Class B foam and/or turnouts containing PFAS and PFAS-containing materials.

187.    Additionally, the Class B foam and/or turnouts that were designed, manufactured, marketed, tested, advertised, marketed, promoted, sold, and distributed by the Defendants contained PFAS or PFAS-containing materials that were so toxic and unreasonably dangerous to human health and the environment, with the toxic chemicals being so mobile and persistent, that the act of designing, formulating, manufacturing, marketing, distributing, and selling these products was unreasonably dangerous under the circumstances.

188.    The Class B foam and/or turnouts designed, manufactured, marketed, tested, advertised, marketed, promoted, sold and distributed by the Defendants were dangerous and defective in design or formulation because, at the time in which the products left the hands of the manufacturer or distributors, the foreseeable risks exceeded the benefits associated with the design or formulation of Class B foam and/or turnouts.

189.    The Class B foam and/or turnouts designed, manufactured, marketed, tested, advertised, marketed, promoted, sold, and distributed by the Defendants were dangerous and defective in design or formulation because, when the PFAS-containing products left the hands of the manufacturer or distributors, said products were unreasonably dangerous, unreasonably dangerous in normal use, and were more dangerous than an ordinary consumer-firefighter would expect.

190.    The Class B foam and/or turnouts were in a defective condition and unsafe, and Defendants knew or had reason to know that these PFAS-containing products were defective and unsafe, especially when used in the form and manner as provided by Defendants. In particular, Defendants PFAS-containing products were defective in the following ways:

191.    When placed in the stream of commerce, Defendants' PFAS-containing Class B foam and/or turnouts were defective in design and formulation and as a result failed to meet ordinary users' expectations as to their safety and failed to perform as an ordinary user would expect;

192.    When placed in the stream of commerce, Defendants' PFAS-containing Class B foam and/or turnouts were defective in design and formulation, and as a result, dangerous to an extent beyond which an ordinary consumer-firefighter would anticipate.

- 59 -
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

193.    When placed in the stream of commerce, Defendants' PFAS-containing Class B foam and/or turnouts were unreasonable dangers in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

194.    When placed in the stream of commerce, Defendants' PFAS-containing Class B foam and/or turnouts contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

195.    When placed in the stream of commerce, Defendants' PFAS-containing Class B foam and/or turnouts did not provide an adequate warning of the potential harm that might result from exposure to PFAS and/or emitted from the Class B foam and/or turnouts and, alternatively, did not have adequate instructions for safe use of the products.

196.    Exposure to PFAS presents a risk of grave and harmful side effects and injuries that outweigh any potential utility stemming from their use;

197.    Defendants knew or should have known at the time of manufacturing, selling, distributing, promoting or marketing their PFAS-containing Class B foam and/or turnouts that exposure to PFAS could result in cancer and other grave and serious illnesses and injuries as alleged herein.

198.    The foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

199.    The Firefighter Plaintiffs used these PFAS-containing products in the ways that Defendants intended them to be used.

200.    The Firefighter Plaintiffs' used these PFAS-containing produces in ways that were foreseeable to Defendants.

201.    The Firefighter Plaintiffs were exposed to PFAS by using Defendants' Class B foam and/or turnouts in the course of their employment, as described above, without knowledge of Class B foam and/or turnouts' dangerous propensities.

202.    The design defect in Class B foam and/or turnouts containing PFAS exposed the Firefighter Plaintiffs to toxic levels of PFAS and therefore, was a substantial factor in causing the Firefighter Plaintiffs' injuries and damages as described herein.

- 60 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

203. As a result of Defendants' design and formulation of a defective product, Defendants are strictly liable in damages to the Firefighter Plaintiffs.

204. As a direct and proximate result of the foregoing acts and omissions, the Firefighter Plaintiffs suffered the injuries and damages described herein.

205. Defendants acted with willful or conscious disregard for the rights, health, and safety of the Firefighter Plaintiffs, as described herein, thereby entitling the Firefighter Plaintiffs to an award of punitive damages.

## SECOND CAUSE OF ACTION

## STRICT LIABILITY – FAILURE TO WARN

206. This cause of action is asserted against all Defendants on behalf of all of the Firefighter Plaintiffs.

207. The Firefighter Plaintiffs incorporate by reference all prior paragraphs of this complaint, as though fully set forth herein.

208. Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired, have engaged in the business of manufacturing, distributing, supplying, testing, labeling, promoting, or advertising of Class B foam and/or turnouts containing PFAS or PFAS-containing materials and, through that conduct, have knowingly placed PFAS-containing products into the stream of commerce with full knowledge that they were sold to fire departments or to companies that sold Class B foam and/or turnouts to fire departments for the use by firefighters such as the Firefighter Plaintiffs, who were exposed to PFAS through ordinary and foreseeable uses for the purpose of firefighting activities and training.

209. The products complained of were manufactured, designed, sold, supplied and/or distributed by each of the Defendants and used by and/or in the vicinity of the Firefighter Plaintiffs during their lifetime and/or they were exposed to PFAS while using Class B foam and/or turnouts in the ordinary course of performing their duties as firefighters.

210. Defendants expected that the PFAS-containing products they were manufacturing, selling, distributing, supplying, and/or promoting would reach firefighters, including the Firefighter Plaintiffs, without any substantial change in the condition of the products from when it was initially

- 61 -
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

manufactured, sold, distributed, and marketed by Defendants.

211. Defendants knew or should have reasonably known that the manner in which they were manufacturing, marketing, and selling Class B foam and/or turnouts containing PFAS was hazardous to human health.

212. The potential risks of using PFAS-containing products presented a substantial danger to firefighters, including the Firefighter Plaintiffs, when the Class B foam and/or turnouts were used or worn in an intended or reasonably foreseeable way.

213. The Firefighter Plaintiffs used Class B foam and wore turnouts in the intended or reasonably foreseeable way in the ordinary course of performing their duties as firefighters, including fire suppression and fire suppression training.

214. The Class B foam and/or turnouts manufactured, marketed, and sold by the Defendants was dangerous and defective because the foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

215. Defendants' products were in a defective condition and unreasonably dangerous, in that Class B foam and/or turnouts which, by design, contain PFAS or PFAS-containing products, are deleterious, toxic, and highly harmful to the Firefighter Plaintiffs.

216. Defendants knew or should have reasonably known that exposure to PFAS was hazardous to human health, but:

    a.    Did not provide an adequate warning of the potential harm that might result from exposure to PFAS or PFAS-containing materials in Class B foam and/or turnouts;

    b.    Did not have adequate instructions for safe use of the products;

    c.    Did not have warnings to persons, such as the Firefighter Plaintiffs, who had been, or reasonably may have been, exposed to Defendants' Class B foam and/or turnouts, of their disease potential, the proper steps to take to reduce the harmful effects of previous exposure, the need to have periodic medical examinations including the giving of histories which revealed the details of the

- 62 -
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

previous exposure, and the need to have immediate and vigorous medical treatment for all related adverse health effects;

d.    Did not manufacture, market, promote, distribute or sell reasonably comparable products not containing PFAS when it became feasible to design.

217.    At the time of manufacture, distribution, promotion, labeling, distribution, and/or sale, Defendants could have provided warnings or instructions regarding the full and complete risks of Class B foam and/or turnouts containing PFAS or PFAS-containing materials, because Defendants knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

218.    At all relevant time, Defendants' Class B foam and/or turnouts did not contain an adequate warning or caution statement, which was necessary.

219.    The Firefighter Plaintiffs were unaware of the defective and unreasonably dangerous condition of Defendants' products at a time when such products were being used for the purposes for which they were intended, and the Firefighter Plaintiffs were exposed to PFAS released from the Defendants' Class B foam and/or turnouts.

220.    The Firefighter Plaintiffs did not and could not have known that the use of Class B foam and/or turnouts in the ordinary course of performing their duties as firefighters could be hazardous to their health, bio-accumulate in the blood, and cause serious health effects, including cancer.

221.    Defendants knew that the use of Class B foam and/or turnouts, even when used as instructed by Defendants, subjected the Firefighter Plaintiffs and others to a substantial risk of harm and yet, failed to adequately warn the Firefighter Plaintiffs, the EPA or the public.

222.    As a result of their inadequate warnings, Defendants' Class B foam and/or turnouts were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used or worn by the Firefighter Plaintiffs.

223.    The lack of adequate and sufficient warnings was a substantial factor in causing the Firefighter Plaintiffs' harm and injuries, as described herein.

224.    As a result of Defendants' failure to provide adequate and sufficient warnings,

- 63 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Defendants are strictly liable in damages to the Firefighter Plaintiffs.

225. As a direct and proximate result of the foregoing acts and omissions, the Firefighter Plaintiffs suffered the injuries and damages described herein.

226. Defendants acted with willful or conscious disregard for the rights, health, and safety of the Firefighter Plaintiffs, as described herein, thereby entitling the Firefighter Plaintiffs to an award of punitive damages.

## THIRD CAUSE OF ACTION

### NEGLIGENCE

227. This cause of action is asserted against all Defendants on behalf of all of the Firefighter Plaintiffs.

228. The Firefighter Plaintiffs incorporate by reference all prior paragraphs of this complaint as though fully set forth herein.

229. Defendants owed a duty of care towards the Firefighter Plaintiffs that was commensurate with the inherently dangerous, harmful, injurious, bio-persistent, environmentally-persistent, toxic, and bio-accumulative nature of Class B foam and turnouts containing PFAS or PFAS-containing materials.

230. Defendants had a duty to exercise reasonable care in the design, research, testing, manufacture, marketing, formulation, supply, promotion, sale, labeling, training of users, production of information materials, use and/or distribution of Class B foam and/or turnouts into the stream of commerce, including a duty of care to ensure the PFAS did not infiltrate, persist in, accumulate in the blood and/or bodies of the Firefighter Plaintiffs and including a duty to assure their products would not cause users to suffer unreasonable, dangerous side effects.

231. Defendants had a duty to exercise reasonable care to ensure that Class B foam and/or turnouts were manufactured, marketed, and sold in such a way as to ensure that the end users of Class B foam and/or turnouts were aware of the potential harm PFAS can cause to human health, and were advised to use it in such a way that would not be hazardous to their health.

232. Defendants had a duty to warn of the hazards associated with PFAS and PFAS-containing materials and were in the best position to provide adequate instructions, proper labeling,

- 64 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

and sufficient warnings about the Class B foam and/or turnouts. However, Defendants knowingly and intentionally failed to do so.

233. Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, formulating, marketing, testing, promotion, supply, sale, and/or distribution of their PFAS chemicals and PFAS-containing products in the regular course of business, in that Defendants knew or should have known that use and exposure to PFAS and PFAS-containing materials was hazardous to human health and created a high risk of unreasonable, dangerous side effects, including but not limited to severe personal injuries, as described herein.

234. Defendants also knew or should have known that the manner in which they were manufacturing, marketing, distributing, and selling Class B foam and/or turnouts containing PFAS or PFAS-containing materials was hazardous to human health, bio-accumulated in the blood, and caused serious health effects, including cancer.

235. Defendants negligently and deceptively underreported, underestimated, downplayed the serious health dangers of the Class B foam and/or turnouts products.

236. Defendants negligently, carelessly and recklessly recommended application and disposal techniques for PFAS and/or for products containing PFAS that directly and proximately caused harm to the Firefighter Plaintiffs.

237. Defendants knew or should have known that firefighters working with and using Class B foam and/or turnouts products would be exposed to PFAS.

238. At all times material, the Firefighter Plaintiffs inhaled, ingested and/or absorbed dermally hazardous PFAS contaminants released from the Defendants' Class B foam and/or turnouts.

239. The Firefighter Plaintiffs' exposure to Defendant's Class B foam and/or turnouts, which were connected to and incidental to Defendants' manufacture, design, sale, supply and/or distribution of its PFAS-containing products, was harmful and substantially increased the risk of injuries to the Firefighter Plaintiffs, and did cause injuries to the Firefighter Plaintiffs.

240. Defendants knew or should have known that the manner in which they were manufacturing, marketing, distributing and selling Class B foam and/or turnouts containing PFAS or PFAS-containing materials would result in harm to the Firefighter Plaintiffs as a result of using Class

- 65 -
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

B foam and/or turnouts in the ordinary course of performing the Firefighter Plaintiffs' duties as firefighters.

241. Defendants knew, foresaw, anticipated, and/or should have foreseen, anticipated, and/or known that the design, engineering, manufacture, fabrication, sale, release, handling, use, and/or distribution of PFAS or PFAS-containing materials in Class B foam and turnouts, and/or Defendants' other acts and/or omissions as described in this complaint, could likely result in PFAS exposure to the Firefighter Plaintiffs, the persistence and accumulation of toxic and harmful PFAS in their blood and/or bodies, and cause injuries to the Firefighter Plaintiffs as herein alleged.

242. Despite knowing, anticipating, and/or foreseeing the bio-persistent, bio- accumulative, toxic, and/or otherwise harmful and/or injurious nature of PFAS materials, Defendants, their agents, servants, and/or employees, committed negligent acts and/or omissions that resulted in PFAS exposure to the Firefighter Plaintiffs, the persistence and accumulation of toxic and harmful PFAS in their blood and/or bodies, and caused injuries to the Firefighter Plaintiffs as herein alleged.

243. Defendants, through their acts and/or omissions as described in this complaint, breached their duties to the Firefighter Plaintiffs.

244. It was reasonably foreseeable to Defendants that the Firefighter Plaintiffs would likely suffer the injuries and harm described in this complaint by virtue of Defendants' breach of their duty and failure to exercise ordinary care, as described herein.

245. As a direct and proximate result of the foregoing acts and omissions, the Firefighter Plaintiffs suffered the injuries described herein, which are permanent and lasting in nature, include physical pain and mental anguish, the need for lifelong medical treatment, monitoring, and/or medications. But for Defendants' negligent acts and/or omissions, the Firefighter Plaintiffs would not have been injured or harmed.

246. Defendants acted with willful or conscious disregard for the rights, health, and safety of the Firefighter Plaintiffs, as described herein, thereby entitling the Firefighter Plaintiffs to an award of punitive damages.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## FOURTH CAUSE OF ACTION

## LOSS OF CONSORTIUM

247. This cause of action is asserted against all Defendants on behalf of all of the Spouse Plaintiffs.

248. The Spouse Plaintiffs incorporate by reference all prior paragraphs of this complaint, as though fully set forth herein.

249. At all times relevant to this action, the following Plaintiffs were and are now lawfully married:

a. Firefighter Plaintiff Mike Tapia and Spouse Plaintiff Bridget Tapia;

b. Firefighter Plaintiff Kevin Bebee and Spouse Plaintiff Victoria Bebee;

c. Firefighter Plaintiff Rob Piper and Spouse Plaintiff Kathy Piper.

250. As alleged above, and as a result of the conduct of the Defendants, Firefighter Plaintiffs sustained severe and permanent injuries and damages.

251. As a proximate result of their husbands' injuries sustained from the exposure and use of Class B foam and/or turnouts in the ordinary course of performing their firefighting duties, The Spouse Plaintiffs were deprived of love, companionship, comfort, care, assistance, protection, affection, society, moral support, sexual relations and conjugal fellowship, during their husbands' illnesses, treatments and recoveries, which deprivation has caused, continues to cause, and in the future is expected to cause each of the Spouse Plaintiffs emotional distress; loss of earning capacity; past, present, and future, and other injuries – the full extent of which has not yet been ascertained, but which will be stated according to proof at trial.

252. As a further direct and proximate result of the aforesaid conduct of Defendants, each of the Spouse Plaintiffs has sustained a loss of consortium, love, society, comfort and affection, and has thereby sustained pecuniary losses, which losses will be stated according to proof at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully prays that this Court grant the following relief:

(1) Compensatory damages, including but not limited to, pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount

- 67 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

according to proof at time of trial;

(2)  Compensatory damages for future damages, including but not limited to Plaintiffs' pain and suffering and for severe permanent personal injuries sustained by the Firefighter Plaintiffs, including for future health care costs, medical monitoring, and/or economic loss.

(3)  Economic damages including but not limited to medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial;

(4)  Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendants, who demonstrated a conscious disregard and reckless indifference for the safety and welfare of the public in general and of the Plaintiffs in particular, in an amount sufficient to punish Defendants and deter future similar conduct, to the extent allowed by applicable law;

(5)  Pre-judgment and post-judgment interest, at the legal rate, on all amounts claimed;

(6)  Attorneys' fees and costs pursuant to C.C.P. § 1021.5 and/or as permitted by law;

(7)  For equitable and injunctive relief, as necessary, to ensure that Defendants refrain from continuing to harm others; and

(8)  Any such further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for each cause of action for which they are entitled to a jury trial.

DATED: September 11, 2020.

PRITZKER LEVINE LLP

By: _____

Elizabeth C. Pritzker (SBN: 146267)
Jonathan K. Levine
Bethany Caracuzzo
Heather P. Haggarty
Richard R. Seal

*Attorneys for Plaintiffs*

- 68 -

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Elizabeth C. Pritzker (SBN: 146627); Jonathan K. Levine (SBN: 220289)<br>Pritzker Levine LLP<br>1900 Powell Street, Ste. 450, Oakland, CA 94608<br><br>TELEPHONE NO.: (415) 692-0772    FAX NO. *(Optional):*<br>ATTORNEY FOR *(Name):* Plaintiffs | **Electronically Filed<br>by Superior Court of CA,<br>County of Santa Clara,<br>on 9/11/2020 11:39 AM<br>Reviewed By: R. Walker<br>Case #20CV370176<br>Envelope: 4916654** |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**
STREET ADDRESS: 191 N. First Street
MAILING ADDRESS: 191 N. First Street
CITY AND ZIP CODE: San Jose, CA 95113
BRANCH NAME: DTS

CASE NAME:
TERESA MAULDIN, ET AL. V. 3M COMPANY, ET AL.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER:<br>**20CV370176** |
|---|---|---|---|---|
| [x] **Unlimited**<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] **Limited**<br>(Amount<br>demanded is<br>$25,000) | [ ] Counter   [ ] Joinder<br><br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[x] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [x] is   [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [x] Large number of separately represented parties
   b. [x] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [x] Substantial amount of documentary evidence
   d. [x] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [x] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [x] monetary  b. [x] nonmonetary; declaratory or injunctive relief  c. [x] punitive
4. Number of causes of action *(specify):* 4: product liability (design defect and failure to warn); negligence; loss of consortium
5. This case [ ] is  [x] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 9-10-20

Jonathan K. Levine
(TYPE OR PRINT NAME)                                   (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courts.ca.gov |

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET     CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice– Physicians & Surgeons
Other Professional Health Care Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip and fall)
Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
Intentional Infliction of Emotional Distress
Negligent Infliction of Emotional Distress
Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/ Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court Case Matter
Writ–Other Limited Court Case Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of County)
Confession of Judgment *(non-domestic relations)*
Sister State Judgment
Administrative Agency Award *(not unpaid taxes)*
Petition/Certification of Entry of Judgment on Unpaid Taxes
Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-harassment)*
Mechanics Lien
Other Commercial Complaint Case *(non-tort/non-complex)*
Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late Claim
Other Civil Petition

ATTACHMENT CV-5012

# CIVIL LAWSUIT NOTICE

**Superior Court of California, County of Santa Clara**
**191 North First St., San José, CA 95113**

CASE NUMBER: 20CV370176

## PLEASE READ THIS ENTIRE FORM

*PLAINTIFF* (the person suing): Within 60 days after filing the lawsuit, you must serve each Defendant with the *Complaint*, *Summons*, an *Alternative Dispute Resolution (ADR) Information Sheet*, and a copy of this *Civil Lawsuit Notice*, and you must file written proof of such service.

---

*DEFENDANT* (The person sued): **You must do each of the following to protect your rights:**

1. You must file a **written response** to the *Complaint, using the proper legal form or format*, in the Clerk's Office of the Court, within **30 days** of the date you were served with the *Summons* and *Complaint*;
2. You must serve by mail a copy of your written response on the Plaintiff's attorney or on the Plaintiff if Plaintiff has no attorney (to "serve by mail" means to have an adult other than yourself mail a copy); and
3. You must attend the first Case Management Conference.

   **Warning: If you, as the Defendant, do not follow these instructions, you may automatically lose this case.**

---

*RULES AND FORMS:* You must follow the California Rules of Court and the Superior Court of California, County of <_CountyName_> Local Civil Rules and use proper forms. You can obtain legal information, view the rules and receive forms, free of charge, from the Self-Help Center at 201 North First Street, San José (408-882-2900 x-2926).

- State Rules and Judicial Council Forms: www.courtinfo.ca.gov/forms and www.courtinfo.ca.gov/rules
- Local Rules and Forms: http://www.sccsuperiorcourt.org/civil/rule1toc.htm

*CASE MANAGEMENT CONFERENCE (CMC):* You must meet with the other parties and discuss the case, in person or by telephone at least 30 calendar days before the CMC. You must also fill out, file and serve a *Case Management Statement* (Judicial Council form CM-110) at least 15 calendar days before the CMC.

*You or your attorney must appear at the CMC.* You may ask to appear by telephone – see Local Civil Rule 8.

---

**Your Case Management Judge is:** Hon. Brian C. Walsh        **Department:** 1

**The 1st CMC is scheduled for:** (Completed by Clerk of Court)

   **Date:** 1/14/21        **Time:** 2:30pm        in **Department:** 1

**The next CMC is scheduled for:** (Completed by party if the 1st CMC was continued or has passed)

   **Date:** _____ **Time:** _____ in **Department:** _____

---

*ALTERNATIVE DISPUTE RESOLUTION (ADR):* If all parties have appeared and filed a completed *ADR Stipulation Form* (local form CV-5008) at least 15 days before the CMC, the Court will cancel the CMC and mail notice of an ADR Status Conference. Visit the Court's website at www.sccsuperiorcourt.org/civil/ADR/ or call the ADR Administrator (408-882-2100 x-2530) for a list of ADR providers and their qualifications, services, and fees.

*WARNING:* Sanctions may be imposed if you do not follow the California Rules of Court or the Local Rules of Court.

---

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

**Complex Civil Guidelines**

*GUIDELINES AND PROTOCOLS*

*COMPLEX CIVIL LITIGATION DEPARTMENT*

Welcome to the Complex Civil Litigation Departments of the Superior Court of California, County of Santa Clara. Ours is one of few Superior Courts selected by the California Judicial Council where case management principles designed to reduce the time and expense normally associated with complex civil litigation cases have been employed.

Counsel are expected to be familiar with the applicable *California Rules of Court*, *Local Rules – Superior Court of California, County of Santa Clara*, *The Santa Clara County Bar Association Code of Professionalism*, and the *Deskbook on the Management of Complex Civil Litigation*. Familiarity with these guidelines and protocols will answer common procedural questions and should assist you in your appearances in these Departments. *Note: These Guidelines and Protocols are revised from previous versions. Your thoughts and suggestions are always welcome. Significant practice highlights include:*

> *The website for the Complex Departments is now integrated into the Court's site, www.scscourt.org.*
>
> *Tentative rulings on motions of all types are posted online by 2:00 p.m. the day before the hearing, and, unless an objection is properly raised by 4:00 p.m. the day before the hearing, the ruling will automatically become the Court's order the next day. For specific information, go to: http://www.scscourt.org/online services/tentatives/tentative rulings.shtml and select the appropriate department.*
>
> *Ex parte hearings require advance reservation with the Coordinator. Letter briefs are not acceptable.*
>
> *Case management conference statements are to be in a combined format; see VII. 3.*
>
> *No discovery motions may be filed until the parties have meaningfully met and conferred AND met with the Court for a face-to-face Informal Discovery Conference.*
>
> *The Court requires detailed JOINT pre-trial statements in advance of a pre-trial conference where counsel are expected to make concrete suggestions as to efficient trial management; see XI.*

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

## Complex Civil Guidelines

<div style="border:2px solid black">

### PLAINTIFF MUST SERVE A COPY OF THESE GUIDELINES WITH THE SUMMONS AND COMPLAINT.

</div>

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | CONTACT INFORMATION | 3 |
| II. | INTRODUCTION | 3 |
| III. | COURTROOM DEMEANOR, CONDUCT AND ETIQUETTE | 4 |
| IV. | GENERAL MATTERS | 5 |
| V. | EX PARTE APPLICATIONS | 5 |
| VI. | DISCOVERY | 6 |
| VII. | LAW AND MOTION | 6 |
| VIII. | CASE MANAGEMENT CONFERENCE | 7 |
| IX. | CASE MANAGEMENT AND REFERENCE ORDERS | 8 |
| X. | MANDATORY SETTLEMENT CONFERENCES (MSC) | 8 |
| XI. | MINI-TRIALS | 9 |
| XII. | PRE-TRIAL CONFERENCE | 9 |
| XIII. | TRIALS - GENERALLY | 13 |
| XIV. | TRIAL EXHIBITS | 18 |
| CURRICULUM VITAE FOR JUDGE BRIAN C. WALSH | | 20 |
| CURRICULUM VITAE FOR JUDGE PATRICIA M. LUCAS | | 22 |

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

## Complex Civil Guidelines

I.    CONTACT INFORMATION

Departments 1 and 3 –          Downtown Superior Courthouse, 191 N 1st Street,
San Jose, CA 95113.

Department 1:

| | | |
|---|---|---|
| Judge | Hon. Brian C. Walsh | 408-882-2110 |
| Courtroom Clerk | Jee Jee Vizconde | 408-882-2113 |
| Bailiff and Deputy Sheriff | Frankie Taranto | 408-882-2111 |

Department 3:

| | | |
|---|---|---|
| Judge | Hon. Patricia M. Lucas | 408-882-2130 |
| Courtroom Clerk | Naomi Matautia | 408-882-2133 |
| Bailiff and Deputy Sheriff | Tina Harrell | 408-882-2131 |

| | | | |
|---|---|---|---|
| Coordinator for Complex | Rowena Walker | 408-882-2286 | rwalker@scscourt.org |
| E-Filing Web Site: | http://www.scscourt.org/forms_and_filing/efiling.shtml | | |

II.    INTRODUCTION

Complex cases suitable for assignment to the Complex Civil Litigation Department are defined in Rule 3.400, California Rules of Court ("Rules" or CRC). Cases will be assigned to the Complex Civil Litigation Department, **for all purposes, including discovery and trial**, by the Court's own motion, or on motion of any of the parties, pursuant to the procedures specified in Rule 3.400. Motions for complexity determination shall be heard in the Complex Civil Litigation Department. It is within the Court's discretion to accept or reject a case for complex designation.

In general, cases assigned to the Complex Civil Litigation Department will be managed in accordance with the principles set forth in the *Deskbook on the Management of Complex Civil Litigation* ("Deskbook").

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

## Complex Civil Guidelines

### III. COURTROOM DEMEANOR, CONDUCT AND ETIQUETTE

1. The Court expects formality, civility and proper decorum at all times. Witnesses and parties are to be addressed and referred to by their surnames. COURTESY AND RESPECT TOWARDS EVERYONE IN THE COURTROOM IS REQUIRED. Advise all witnesses and parties to observe appropriate courtroom demeanor and punctuality. The civil and courteous treatment of courtroom staff and opposing counsel is a paramount professional obligation of counsel.

The Santa Clara County Superior Court, by standing order, has adopted the Code of Professionalism of the Santa Clara County Bar Association. Counsel are expected to be familiar with the Code and use it as a guide for appropriate attorney behavior.

2. All pagers, cell phones and other audible electronic devices must be TURNED OFF while in the courtroom whether or not court is in session.

3. Do not approach the clerk or reporter while court is in session for any reason.

4. Objections, statements and arguments must be addressed to the Court rather than opposing counsel. Counsel may speak from the lectern (if present) or the counsel table. Counsel must stand when objecting or addressing the Court. Counsel may approach any witnesses as necessary only with leave of Court.

5. At the end of each day, counsel must clear work areas including the area in the rear of the courtroom.

6. Use of the department's copier or telephone requires the Court's permission.

7. It is counsel's responsibility to note the date and time set for any future hearing. Hearing dates are set by contacting the Coordinator.

8. Courtroom staff will not make copies at counsel's request unless directed to do so by the Court. Copy work completed by courtroom staff is subject to the current per-page copy fee.

9. If a peremptory challenge or challenge for cause is upheld, the case will be referred to the Civil Supervising Judge for reassignment.

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

## Complex Civil Guidelines

IV. <u>GENERAL MATTERS</u>

1.  The Court expects all counsel to maintain regular communication with each other regarding hearing dates, progress of the case, and settlement possibilities. A condition of remaining in a complex department is that counsel will behave toward all counsel and other participants with civility, courtesy and professionalism, both in and out of court. Meeting and conferring with opposing counsel on both procedural issues as well as substantive issues is mandated.

2.  Continuances of hearing or trial dates are discouraged but may be necessary from time to time. Continuances of hearings and trial dates by stipulation are not permitted without prior approval of the Court, and only to a date pre-approved by the Court. Please call the Coordinator for available dates before contacting other counsel. If preliminary approval is given, a written stipulation must be provided before the hearing or trial date. Faxed signatures on stipulations are permitted.

3.  In the event a case settles before a court hearing or trial date, parties must telephonically notify the Court as soon as the disposition is agreed upon and must file with the Complex Litigation Department either a Notice of Settlement, Request for Dismissal, a Stipulation for Entry of Judgment or a Judgment on Stipulation that is ready for the Court's signature. If the applicable document is not ready, counsel must appear at the time scheduled for hearing and recite the settlement for the record.

4.  Cross-complainants must serve a copy of these guidelines upon any new parties and give notice of any scheduled hearings and depositions at the time the cross-complaint is served.

5.  All actions classified as complex or provisionally complex are subject to the Court's Electronic Filing and Service Standing Order, unless exempted by order of the Court for good cause. Further information is posted on the Court's website at
***http://www.scscourt.org/forms_and_filing/efiling.shtml*** .

V.   <u>EX PARTE APPLICATIONS</u>

1.  Ex parte appearances are discouraged except in unusual situations. Hearing dates must be coordinated with the Complex Coordinator. Strict compliance with CRC Rules 3.1200-3.1207 is required. In addition, the ex parte application and all supporting papers, including any proposed pleading, motion or order shall be electronically submitted to the Court's website by noon the Court day before the scheduled ex parte hearing date.

2.  The Court is eager to assist counsel when specific problems arise that may not require a formal motion. To arrange a conference with the Court when all counsel agree to the advisability of such a discussion, please contact the Coordinator to reserve a time for the conference. In these

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

## Complex Civil Guidelines

instances "letter briefs" are not acceptable, but briefs on court pleading paper not exceeding 3 pages may be submitted.

3.   Though the Court prefers personal appearances by counsel, counsel may appear by telephone, with the Court's prior permission, at counsel's expense.

## VI. DISCOVERY

1.   The Court believes in open discovery in accordance with the law, but expects counsel to refrain from engaging in excessive and abusive discovery.

2.   Discovery meet and confer obligations require an in-person conference between counsel.  If a resolution is not reached, parties are required to meet and confer in person with the Court for all discovery-related hearings **before filing any discovery motion, unless otherwise authorized by the Court**.  Each side must serve and lodge a short brief, **limited to no more than 3 pages**, two court days in advance of the meeting.  To schedule an informal discovery conference (IDC) with the Court, please contact the Coordinator.

3.   **Any dates given by the Court relating to this IDC process have no impact on statutory deadlines for filing motions or any other papers, including, but not limited to, the 45-day deadline for filing a motion to compel further responses. The party who files a discovery motion must address the motion's timeliness in its moving papers.**

4.   Counsel and/or parties with full authority to resolve the discovery issue(s) must personally attend the IDC unless excused by the court.

## VII.   LAW AND MOTION

1.   Law and Motion matters are generally heard Fridays at 9:00 a.m.

2.   Counsel must first clear the hearing date with the other parties before contacting the Coordinator.  You must provide the Court with the name of the case, the case number, type of hearing, hearing date requested, and name and telephone number of the filing attorney.

3.   Before the hearing of **any** motion, petition or application, all counsel and parties representing themselves shall communicate in a good faith effort to eliminate the necessity of the hearing.

4.   **The Court values the importance of the training of the next generation of trial lawyers, which must include substantive speaking opportunities in court.  The Court strongly**

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

## Complex Civil Guidelines

**encourages the parties and senior attorneys to allow the participation of junior lawyers in all court proceedings, particularly in arguing motions where the junior lawyer drafted or contributed significantly to the motion or opposition.**

5.   Motions or applications to seal must be heard no later than any motion relying on the materials for which sealing is sought. Upon denial of a motion or application to seal, the moving party must notify the Court that the materials are to be filed unsealed (CRC Rule 2.551(b)(b)) or refrain from relying on the materials, which will not be part of the record.

6.   When the Court sustains a demurrer or grants a motion to strike with leave to amend and an amended pleading is filed, the plaintiff or cross-complainant shall file with its opposition to any successive demurrer or motion to strike a redline comparing the amended pleading to the previous version of the pleading.

7.   Counsel for moving parties must notify the Court as soon as possible regarding any matter to be taken off calendar or continued. Notice of continuances of hearings must be provided by the moving party.

## VIII.   CASE MANAGEMENT CONFERENCE

1.   The first case management conference is generally scheduled one hundred twenty (120) days after the action is filed. Plaintiff is required to give notice of this conference date to all other parties.

2.   Case Management Conferences are generally heard Fridays at 10:00 a.m. and are scheduled as necessary to monitor the progress of the case and to assist counsel and the parties as the matter progresses. The parties should expect the Court to schedule a status conference approximately every 120 days.

3.   Judicial Council Form CM-110, Civil Case Management Statement (required by CRC 3.725(c)), is not well-suited for complex cases. Instead, the parties shall file a joint case management statement no later than five calendar days prior to the hearing for each conference addressing the following subjects:

> (a) a brief objective summary of the case,
> (b) a summary of any orders from prior case management conferences and the progress of the parties' compliance with said orders,
> (c) significant procedural and practical problems which may likely be encountered,
> (d) suggestions for efficient management, including a proposed timeline of key events, and
> (e) any other special consideration to assist the Court in determining an effective case management plan.

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

## Complex Civil Guidelines

A status conference statement may be filed as an alternative to the case management statement when appropriate. A status conference statement is generally less detailed than a case management statement and is to be used to advise the Court of progress or developments in the case which have occurred since the last review hearing.

## IX. CASE MANAGEMENT AND REFERENCE ORDERS

1. Case Management Orders are not required in all cases, but may be helpful in cases where the sequencing and timing of key events are necessary in the management of the litigation and preparation of the case for trial. However, even if a case management order is not necessary in a particular case, all complex cases must be managed by counsel, or the court, or both.

2. Mediation and Reference matters should not commence until all parties are before the Court but not later than six months after the original complaint was filed, except for good cause.

3. Mediation and Reference matters should be concluded 12 months after their initiation (approximately 18 months after the original complaint was filed), except for good cause.

4. Brevity in drafting the Order may help focus your case and assist in reaching the desired goal (i.e., early informed resolution of your case in a cost-effective manner).

5. After a date is scheduled with the Court, it may not be continued by stipulation of the parties without the Court's consent.

## X. MANDATORY SETTLEMENT CONFERENCES (MSC)

1. If there is an objection to the trial judge's participation in the mandatory settlement conference, counsel must advise the Court as soon as possible, and in no event, later than the date the MSC is set. No case will be tried before a good faith effort is made to settle. Mandatory settlement conferences set on the court's calendar are typically set at the time the trial is set, and generally, the final mandatory settlement conference takes place a week to two weeks before the first day of trial, typically on a Wednesday.

2. Trial counsel, parties and persons with full authority to settle the case must personally attend unless excused by the Court. If insurance coverage is available to satisfy the plaintiff's settlement demand and a representative of defendant's insurer with full settlement authority attends the mandatory settlement conference with defendant's trial counsel, named defendants need not attend unless their personal consent is necessary to settle the case. Named defendants must also personally attend the mandatory settlement conference when (a) there is an insurance coverage

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

## Complex Civil Guidelines

dispute; (b) plaintiff seeks to recover damages not covered by insurance; or (c) plaintiff's demand exceeds insurance policy limits. Failure to appear will result in the imposition of sanctions. Settlement Conference Statements must be filed at least five (5) court days before the scheduled conference (Rule 3.1380).

3. Any request for a waiver of the requirement to personally appear at the MSC, whether conducted by the Court or a special master, must be made by written application to the Court.

## XI. MINI-TRIALS

There may be a pivotal issue, such as a special defense or evidentiary ruling, upon which the rest of the case depends. If counsel agree, the Court will set aside time before or during the trial to hear mini-trials on such issues. Time will be appropriately limited. Briefs and factual stipulations must be submitted in advance. Limited testimony may be taken, for example, as in an Evidence Code § 402 situation. Contact the Coordinator to schedule a date and submit a stipulation signed by all counsel.

## XII.    PRE-TRIAL CONFERENCE

There will be a detailed pre-trial conference 10-15 days before trial to discuss procedural issues and preliminary matters in order to make the trial process as predictable and smooth as possible.

The conference may be a time for the Court to discuss trial evidence presentation and use of audio-visual equipment. The conference is not for the purpose of hearing motions in limine. An example of an issue for the conference: Product liability case in which the manner of presenting the underlying case is of concern. Will the Court allow counsel to read the transcript into the record? Live testimony? A combination of transcript and live testimony? Is a trial by jury requested?

At least 10 days before the pretrial conference, counsel shall meet and confer and execute necessary documents listed below. Counsel shall meet in person at a mutually agreeable time and location.

At the meet and confer, the parties shall:

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

## Complex Civil Guidelines

1.  Prepare a **Joint Statement of the Case.**

2.  Prepare a **Joint Witness List**, excluding impeachment or rebuttal witnesses, with accurate time estimates.

Witness lists should not be exaggerated. Only witnesses that a party expects to actually call should be listed, with a brief synopsis of the proposed testimony. In addition to the list contained in the statements, each list should also be prepared in the form attached as follows. Witnesses should be listed last name first. Titles (e.g. Dr., Officer) should be placed after the comma following the last name. This is so that lists can be sorted correctly.

As noted above, Counsel should include in their witness list the amount of time they expect to spend on direct examination of each witness. The amount of time should be stated in minutes (*not* days or hours). Counsel must also be prepared to state at the conference how much time they will require for cross-examination of each witness identified on the other party's list.

At the conference the Court will make separate arrangements for the preparation of a joint list, for jury selection purposes, of possible witnesses and persons or entities who might otherwise be mentioned at trial.

Format for Witness Lists

*Plaintiffs' List*

| Witness | Party (P or D) | Direct (min.) | Cross (min.) | Redirect (min.) | Total | Subject |
|---|---|---|---|---|---|---|
| Smith, John | P | 20 | 30 | 5 | 55 | Formation of contract |
| Brown, Nancy | P | 15 | 20 | 5 | 40 | Breach of contract |
| White, Ron | P | 70 | 10 | 15 | 95 | Damages |
| Black, Peter | P | 60 | 30 | 15 | 105 | Formation of contract |
| | P | 120 | 100 | 30 | 250 | Damages |

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

## Complex Civil Guidelines

| Garcia, Dr. Ruth | | | | | | |
|---|---|---|---|---|---|---|
| Rogers, Officer Ted | P | 60 | 30 | 10 | 100 | Arrest of Susan Petersen |

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

## Complex Civil Guidelines

*Defendant's List*

| Witness | Party (P or D) | Direct (min.) | Cross (min.) | Redirect (min.) | Total | Subject |
|---|---|---|---|---|---|---|
| Doe, Edward | D | 20 | 10 | 5 | 35 | Formation of contract |
| Chang, Sam | D | 75 | 30 | 15 | 120 | Damages |
| Martin, Dr. Eric | D | 120 | 60 | 30 | 210 | Damages |

3. Exchange **exhibits** and inspect photos and diagrams (to be submitted on the date of trial), excluding those contemplated to be used for impeachment or rebuttal. **Stipulate to all facts amenable to stipulation.**

4. Prepare a **Joint List of Controverted Issues**. If all the parties fail to agree to an issue as controverted or uncontroverted, then the issue is controverted. (Required for both jury and non-jury trials).

5. Exchange all **motions** in limine.

6. Prepare *voir dire* questions for the Court to include when examining the panel.

7. Execute the **Statement of Compliance** indicating counsel has complied with the Local Rules and these Guidelines.

8. Prepare joint proposed **jury instructions** (CACI only) and verdict forms, and exchange disputed instructions.

The above items, including opposition to motions in limine, trial briefs and the Statement of Compliance signed by all counsel, shall be submitted to the Complex Civil Litigation Coordinator **no later than noon on the 1st court day before the date set for trial, or such other time and date set by the Court.**

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

## Complex Civil Guidelines

## XIII.  TRIALS - GENERALLY

1.  **General Matters – the following applies to all trials (jury and non-jury):**

   a.  Trials generally will proceed four days a week as follows:  Monday through Thursday (9:00 a.m. to 4:30 p.m.).  The Court will provide the parties, generally at the conclusion of the Mandatory Settlement Conference, a proposed trial schedule.

   b.  Jury deliberations will proceed five days a week, from 9:00 a.m. to 4:30 p.m.

   c.  Trial attorneys should be in the courtroom 30 minutes prior to the start of each morning session, unless another time is agreed upon by the Court.  Counsel should expect that the court will take appropriate action if counsel is late for any appearance and does not have a justification for a late appearance.

   d.  Before rearranging tables or other courtroom furniture, or installing equipment such as projectors or screens, permission must first be obtained from the bailiff or the Court.

   e.  Unless the Court expressly advises otherwise, counsel may not approach a witness who is testifying to hand the witness exhibits, or to help the witness locate portions thereof, without first obtaining the Court's permission.

   f.  Counsel must advise opposing counsel and the Court of the identity of each witness intended to be called by 4:30 p.m. the day preceding the time for the witness or witnesses to testify.

   g.  Counsel presenting their case shall be expected to have witnesses ready to call through at least 4:30 p.m., and may be deemed to have rested their case if they are not prepared to proceed.  Counsel shall advise the Court immediately of any circumstances which may prompt a request for a modification of the established trial schedule.

   h.  Counsel should advise the Court at the outset of the proceedings, or as soon as the issue becomes apparent, of any legal issues or evidentiary matters that counsel anticipate will require extended time for consideration or hearing outside the presence of the jury.

   i.  If during the course of trial, counsel wish to discuss a matter with the Court and opposing counsel outside of the presence of the jury, counsel MUST advise the Court of this request at the conclusion of the preceding court session and NOT immediately before proceedings are scheduled to resume.

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

## Complex Civil Guidelines

j.    The amount of jury fees required to be posted in advance of a jury trial is $150.00. CCP §631(b). If a case settles after jury fees have been deposited, the jury fees will not be returned unless the Court is notified of the settlement by 2:00 p.m. on the court day preceding the trial date for which the deposit was made.

k.    The court does not provide court reporters in complex civil cases. See General Local Rule 7. If one or more parties privately arrange for court reporter services, the failure of such court reporter to appear will not be grounds for continuing or delaying a trial or other proceedings.

l.    Counsel must confer in advance of the trial, attempt to stipulate on as many issues and facts as possible, and reduce all stipulations to writing. The written stipulation is filed and during jury trials is read aloud into the record.

m.    **The Court strongly encourages the parties and senior attorneys to permit junior lawyers to have an important role at trial, including the examination of witnesses.**

2.  **Documents**

Unless the case was settled at the Mandatory Settlement Conference or dismissed in full prior thereto, or unless otherwise ordered by the Court, the following items must be lodged in the department of the trial judge or, if none, with the Complex Civil Coordinator, and served on all other parties by noon on the last court day before the date set for trial:

(1) all in limine motions and a list of the in limine motions;

(2) exhibit lists/indices, except impeachment exhibits;

(3) witness lists, except impeachment witnesses, and unusual scheduling problems; each witness listed shall include a succinct (no more than one or two sentences) statement of the general subject matter of the witness' testimony and an estimate of the time that will be required for the direct examination of each such witness;

(4) jury instruction requests, except for instructions that cannot reasonably be anticipated prior to trial;

(5) proposed special verdicts;

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

## Complex Civil Guidelines

(6) any stipulations on factual or legal issues;

(7) a concise, non-argumentative statement of the case to be read to the jury in jury trials;

(8) trial briefs;

(9) the original of all deposition transcripts to be used during the course of the trial. If counsel anticipates reading from the deposition transcript for any purpose other than impeachment, counsel must deliver to opposing counsel a written specification of the pages and lines proposed to be read.

An extra copy of all the above documents (except deposition transcripts) shall be delivered to the courtroom clerk on the morning of the trial for use by the clerk.

Counsel seeking to display to the jury any exhibit which required time and equipment to observe, such as slides, transparencies, movies, videotapes and audiotapes, MUST make such exhibit available to opposing counsel for review prior to commencement of the session of court at which the exhibit will be used. Proceedings will not be delayed to permit such a review if the review has not occurred by the time court is scheduled to begin.

3. **Technology**

    Counsel must meet and confer regarding the use of computers, projectors, screens and other forms of equipment for showing evidence to the jury or Court. Counsel must confer with court staff regarding the placement and use of any such equipment.

4. **Stipulations**

    Prior to the commencement of trial, all counsel will be requested to stipulate:

    1. At the commencement of each session of the Court, all parties, attorneys and jurors are present unless otherwise indicated.

    2. After the first occasion on which the jury has been admonished not to discuss or prejudge the case in conformity with CCP § 611, the jury will be deemed to have been so admonished at every subsequent recess or separation without the need for further admonition; and

    3. Reporting of juror voir dire and jury instructions are waived.

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

## Complex Civil Guidelines

### 5. Opening and Closing Arguments

a.    Counsel should avoid discussing routine matters of court procedure, such as the sequence of trial, in opening statements and closing arguments. These matters will be covered by the Court and need not be repeated by counsel.

b.    Do not display charts, diagrams or proposed exhibits to the jury until they have been shown to opposing counsel outside of the presence of the jury. If opposing counsel indicates no objection, the exhibits or other object may be displayed to the jury without first requesting Court approval. If opposing counsel objects, the exhibit or object may not be displayed without Court approval, which must be requested outside the presence of the jury.

### 6. Examination of Witnesses

a. Objections: Counsel should only state the legal ground(s) of objection and, unless the Court specifically requests explanation or argument, should refrain from argument, elaboration, or any other form of extended objection-making. Counsel may request permission to approach the side bar to present argument, but should not approach unless and until the Court grants the request.

b. When calling a witness to testify under Evidence Code section 776, do not announce in the presence of the jury that the witness being called under this provision or as a "hostile" or "adverse" witness. Simply proceed with the examination of the witness; the Court will rule upon the applicability of section 776 only if such a ruling is required by an objection asserted by opposing counsel.

c. Do not propose a stipulation to opposing counsel in the hearing of the jury unless there is prior agreement of counsel.

### 7. Transcripts

a.    If counsel anticipates requesting a transcript of the testimony of any witness or other proceedings during the course of trial, arrangements should be made with the

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

## Complex Civil Guidelines

court reporter <u>in advance</u> so that arrangements can be made to obtain a second court reporter if necessary.

b.     If counsel requests any court reporter to prepare a transcript of any portion of the proceedings, counsel MUST contemporaneously advise opposing counsel of the request and of the precise portions that will be transcribed.

8. **Jury Trials**

a.     Motions in limine and other trial-related preliminary motions (such as Evidence Code § 402) must be submitted in writing before answering ready.   Motions in limine may be ruled on by the Court without hearing.  Such motions should be brief and should address specific subject matter. See *Amtower v. Photon Dynamics, Inc.*, (2008) 158 Cal.App.4th 1582.

b.     CACI instructions are to be used. Submit proposed instructions in Word format. When reasonably possible, mark up the official version rather than retyping so the changes are apparent to the Court and other counsel.  The Court may send at least 4 "clean" sets of instructions provided by counsel into the jury room.  "Clean" means just the text of the instruction, as corrected. Plaintiff has the primary, but not exclusive, responsibility to provide the "clean" sets, in binders.

c.     Counsel should consider stipulating that the determination as to which members of the trial jury shall be alternates will be determined by random draw of names immediately before deliberations commence. If counsel so stipulate, the size of the panel selected at the outset of trial will be 12 plus the number of alternates expected to be needed, with the peremptory challenges allotted to each side increased by the number of jurors in excess of 12.

d.     <u>Hardship Requests</u> - Requests by members of the panel to be excused on the ground of undue hardship will be considered by the court prior to beginning voir dire examination.

e.     Jury selection proceeds generally under the "6 pack" method, modified to fit the case.  Court and counsel will work out the management of voir dire in accordance with CCP § 225.5 to fit the circumstances of the case.  Counsel may submit specific juror questions for the Court to consider asking during voir dire.

f.     Voir dire examination will initially be directed to 18 or more members of the jury panel seated in the jury box.  Any of these 18 or more panel members excused for cause will be replaced by additional panel members before peremptory challenges begin.   Peremptory challenges will then proceed, directed to the first 12 panel members, who will be replaced by the next six panel members in order as any of

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

## Complex Civil Guidelines

the 12 are peremptorily challenged. The peremptory challenges will continue until the panel seated in the jury box is reduced to 11 members, at which time additional panel members (normally an additional seven) will be selected and examined prior to resuming peremptory challenges. Whenever there are successive passes from all parties who have not exhausted their challenges, or all parties exhaust their challenges, the jury has been selected and will be sworn. The same process will then continue for the selection of alternate jurors.

g.    All challenges for cause will be heard out of the hearing of the jury panel.

h.    The Court will initiate voir dire examination. Upon completion of the judge's examination, Counsel will have the right to examine the jurors within reasonable time limits prescribed by the trial judge.

i.    The Court preinstructs the jury once it is empaneled. CACI Instructions relating to the basic responsibilities of the jurors, management of evidence and the like will be given and, in most cases, repeated at the close of trial.

j.    Objections of any kind are to be addressed to the Court (not to other counsel) with a concise statement of the legal grounds. Argument on the objection without invitation by the Court is not permitted. Advise the Court if argument is necessary for the record.

k.    Make no references to charts, models, blowups or other demonstrative evidence in front of the jury unless: (a) it is in evidence; (b) counsel have previously stipulated the item is in evidence; or (c) you have leave of Court to use the reference.

## XIV.    TRIAL EXHIBITS

1.    **Introduction**

a.    The electronic representations of such exhibits may be presented to the Jury/Court as substitutes for the exhibits themselves. Counsel should keep in mind that one of the purposed of the complex project is to enhance the orderly presentation of evidence to the fact finder, and to maintain the record for potential post trial proceedings.

b.    Exhibits may be in either electronic or physical form. Physical exhibits are not required to be presented in a digitized format. However, at the conclusion of trial the court may order that a photo be substituted and stored electronically in lieu of the physical evidence.

c.    Parties must exchange exhibits excluding documents for bona fide impeachment at the Pre-Trial Meet and Confer. Each counsel must provide the Court with an EXHIBIT LIST

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

## Complex Civil Guidelines

describing each exhibit, indicating whether the exhibit is to be admitted into evidence by stipulation.

d. Counsel must submit to the Clerk original negotiable instruments for cancellation pursuant to Rule 3.1806, unless otherwise ordered by the Court.

2. **Submission of Exhibits**

a. Counsel must provide the Court with the exhibits, plus one copy. Exhibits will be marked by the Clerk, as they are identified, in chronological order. Exhibits shall not be pre-marked by counsel.

b. Enlargements and transparencies normally will not be admitted into evidence. Any large exhibit or transparency should be accompanied by an 8½ x 11 version to which the exhibit tag is attached. Models, etc. should be photographed if proposed as exhibits. Be sure to discuss evidentiary issues of this nature with opposing counsel.

c. Interrogatories and Requests for Admissions which are expected to be used at trial must be extracted and lodged with the Court, and a copy given to counsel, at the appropriate time. In jury trials, questions and answers must be read into the record, subject to proper objections. The extracts may be submitted as exhibits in a Court trial. In no case will entire sets of written discovery documents be lodged or received.

d. Before trial commences, counsel will be asked to sign a stipulation for the return and maintenance of exhibits when the trial is completed. Plaintiff will maintain joint exhibits, unless otherwise stipulated.

3. **Use of Deposition Transcripts**

a. Deposition transcripts which are expected to be used at trial must be lodged with the Court on the first day of trial. Pertinent provisions must be read into the record in jury trials, subject to proper objections. In Court trials, extracts may be submitted and marked as exhibits. In no case will an entire transcript be received.

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

## Complex Civil Guidelines

**CURRICULUM VITAE FOR JUDGE BRIAN C. WALSH**

Judge Brian C. Walsh
Superior Court of California
County of Santa Clara
191 North First Street
San Jose, California 95113
Department 1
408-882-2110

**JUDICIAL CAREER:**

Appointed to the Superior Court December 15, 2000
--Elected to 6-year terms (unopposed): 2002, 2008, 2014
Complex Civil Litigation, 2017-
Presiding Judge, 2013-14
Assistant Presiding Judge, 2011-12
Civil Trials, 2003-04, 2007-09, 2011-12, 2015-16
Family Law, 2009-10
Felony Trials, 2005-07
Appellate Division, 2005
Supervisor, Misdemeanor Direct Calendars, 2002-03
Misdemeanor Direct Calendar, 2001

6th DCA, Pro Tem Justice:
   June 1-November 30, 2016
   June 1-September 30, 2015
   July 1-December 31, 2011
   May 1, 2004-January 17, 2005

California State-Federal Judicial Council, 2003-present
Language Access Plan Implementation Task Force, 2015-present
Chair, Trial Court Presiding Judges' Advisory Committee, 2013-2014
Member, Judicial Council of California, 2013-2014
Chair, Task Force on Trial Court Fiscal Accountability 2013-2014
Supreme Court Judicial Ethics Advisory Comm., 2002-2013
Financial Accountability & Efficiency Comm. ("A & E"), 2011-2013
Trial Court Budget Advisory Committee, 2013-2014
--Funding Methodology (WAFM) Subcommittee, 2012-2014

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

## Complex Civil Guidelines

**Judicial Branch Budget Advisory Committee, 2002-03**
**Chief Justice Task Force on ACA 1 (Judicial Elections), 2001**
**California Judges' Association, 2000-present**
**State Bar Attorney Civility Task force, 2006-08**
**State Bar Task Force on Support for Legal Services, 2006-08**

**2016 State Bar of California Professional Responsibility Award**
**2014 Outstanding Jurist Award, Santa Clara County Bar Association**
**2012 Trial Judge of the Year, Santa Clara County Trial Lawyers**
**2002 Salsman Award: Contributions to Community/Profession**

**EDUCATION:**

**Boalt Hall School of Law**
**University of California at Berkeley**
**J.D., 1972**

**University of Notre Dame**
**B.A., 1969**

**Date of Birth: November 11, 1947 (San Jose, California)**

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

## Complex Civil Guidelines

CURRICULUM VITAE JUDGE PATRICIA M. LUCAS

**Judge Patricia M. Lucas**
**Superior Court of California**
**County of Santa Clara**
**191 North First Street**
**San Jose, California 95113**
**Department 3**
**408-882-2130**

**JUDICIAL CAREER:**

**Appointed to the Superior Court December 20, 2002**
**Elected to 6-year terms (unopposed): 2004, 2010, 2016**
**Complex Civil Litigation, 2020-**
**Presiding Judge, 2017-18**
**Assistant Presiding Judge, 2015-16**
**Civil Trials, 2013, 2016**
**Civil Pretrial Case Management, 2011-12, 2014-15**
**Civil Discovery/Trials, 2004**
**Supervising Judge, Civil Division, 2014-15**
**Family Law, 2005-08**
**Supervising Judge, Family Division, 2006-08**
**Appellate Division, 2004, 2013**
**Presiding Judge, Appellate Division, 2013**
**Criminal Trials, 2003, 2009-10**
**Temporary assignment on the Sixth District Court of Appeal, 2011**

**Chair, Trial Court Presiding Judges Advisory Committee, 2017-18**
**Member, Judicial Council of California, 2017-18**
**B. E. Witkin Judicial College of California: Dean, 2017-18**
 **Associate dean, 2015-16**
 **Faculty, 2004 to present**
 **Seminar leader, 2005-06 and 2009-2014**
**Faculty/Seminar Leader, New Judge Orientation, 2005 to present**
**Faculty, CJER Civil Law Institute, 2006 to present**
**Member, CJER New Judge Educ./Judicial College Steering Committee;**
 **New Judge Orientation Working Group;**
 **Experienced Judge Working Group (chair)**
**Member, CJER Governing Committee, 2005, advisory member, 2015-18**
**Member, Judicial Council Civil & Small Claims Advisory Committee,**

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised January 21, 2020

## Complex Civil Guidelines

2006-2015 (chair, 2013-15)
Member and vice-chair, Judicial Council Court Facilities Advisory
Committee, 2011 to present
Member, Elkins Family Law Task Force and Implementation Task Force,
2008-12
Instructor, National Institute for Trial Advocacy, 1990 to present

Private practice, complex civil litigation, 1979-2003
University of California, Berkeley, J.D.
Rice University, B.A.